Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo CA 94402
(650) 781-0025
jake@blockleviton.com

*Counsel for Plaintiff James Kelly*

[Additional Counsel Appear on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

JAMES KELLY, Derivatively on Behalf of
BLOCK, INC.,

                    Plaintiff,

          v.

JACK DORSEY, AMRITA AHUJA, ROELOF
BOTHA, AMY BROOKS, SHAWN CARTER,
PAUL DEIGHTON, RANDY GARUTTI,
JAMES MCKELVEY, MARY MEEKER,
ANNA PATTERSON, SHARON
ROTHSTEIN, LAWRENCE SUMMERS, and
DAVID VINIAR,

                    Defendants,

and

BLOCK INC.,

                    Nominal Defendant.

Case No.: _____

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

I.    NATURE AND SUMMARY OF THE ACTION ................................................. 6

II.   JURISDICTION AND VENUE ....................................................................... 11

III.  PARTIES ........................................................................................................ 11

    A.    Plaintiff ................................................................................................ 11

    B.    Current Director Defendants ............................................................... 12

    C.    Former Director Defendants ................................................................ 13

    D.    Officer Defendants .............................................................................. 13

    E.    Nominal Defendant .............................................................................. 13

    F.    Relevant Non-Parties .......................................................................... 14

IV.   SUBSTANTIVE ALLEGATIONS ................................................................... 14

    A.    Company Background ........................................................................... 14

        1.    Through "Frictionless" Onboarding, Block's Cash App
              Grows to Outperform its Inaugural Point-of-Sale Product. ..................... 14

        2.    As a Financial Institution, Block Is Subject to Various
              Record-Keeping and Reporting Requirements. ........................................ 17

        3.    Maintaining Effective Compliance Measures Is a
              "Mission Critical" Function for Block ....................................................... 17

    B.    Duties of the Board of Directors and the Audit and Risk Committee ................. 18

        1.    Duties of the Board of Directors ................................................. 18

        2.    Duties of the Audit and Risk Committee ................................... 20

    C.    Defendants Repeatedly Made False Assurances to Shareholders
          Concerning the Company's Comprehensive Compliance Measures. ................... 22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

D.    The Individual Defendants Failed to Correct Identified Compliance Deficiencies Despite Numerous Red Flags. ..................................... 27

    1.    Suspicious Activity Reports Ballooned Throughout the Relevant Period. ................................................................. 28

    2.    The Individual Defendants Refused to Implement Adequate Legal Compliance and Risk Oversight at the Company Despite Years of Red Flags Indicating Woefully Deficient Systems. .................................................................. 31

    3.    The Board Failed to Oversee Critical Compliance Functions, Which Were Outsourced to a Third-Party Vendor. ................................. 64

    4.    The Board Was Unaware of the CFPB Investigation for More than a Year and a Half. ................................................. 66

E.    News Reports Reveal to Shareholders that Block's Assurances of a Comprehensive Compliance Program Were Not True. ......................................... 67

F.    The Director and Officer Defendants Are Obstinate After the Release of the Hindenburg Report. ......................................................... 74

G.    The Individual Defendants' Failure to Ensure That the Company Implemented Adequate Compliance Measures and Managed Attendant Risks Subjects Block to Adverse Regulatory Actions and $295 Million in Penalties. ............................................................. 76

H.    A Securities Class Action Lawsuit Is Filed against the Company for Issuing Materially Misleading Statements Concerning the Wrongdoing Alleged Herein. ......................................................... 81

V.    BLOCK IS A CONTROLLED COMPANY ................................................. 82

VI.    INSIDER TRADING CLAIMS ................................................................. 84

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

A. Block's Insider Trading Policy Proscribes Insider Trading...............................84

B. The Company's Two Co-Founding Directors, Dorsey and McKelvey, Collectively Sold Over $1 Billion of Block Stock at Artificially Inflated Prices While in Possession of Material Non-Public Information. .......................85

VII. **DEFENDANTS SOLICITED SHAREHOLDER APPROVAL FOR ELECTIONS AND COMPENSATION THROUGH MATERIALLY MISLEADING PROXY STATEMENTS.** ........................................................................................87

VIII. **DEMAND FUTILITY AND INDEPENDENCE ALLEGATIONS** ...........................95

A. Demand Is Excused Because a Majority of the Demand Board Faces a Substantial Likelihood of Liability for the Misconduct Alleged Herein. ..........95

  1. The Current Director Defendants Face a Substantial Likelihood of Liability for Breaching their Fiduciary Duties..........................................95

  2. Botha and Deighton Face a Substantial Likelihood of Liability for Breaching their Fiduciary Duties as Members of the ARC. ...............96

  3. Dorsey Faces a Substantial Likelihood of Liability for Breaching His Fiduciary Duties as an Officer of the Company................................97

  4. Dorsey and McKelvey Face a Substantial Likelihood of Liability for Engaging in Insider Selling During the Relevant Period. ...................97

B. Demand Is Further Excused Because a Majority of the Demand Board Lacks Independence from Dorsey and/or McKelvey. ..........................................98

  1. Defendant Forsey Further Lacks Independence. ......................................98

  2. Defendant McKelvey Further Lacks Independence. ................................99

  3. Defendant Botha Further Lacks Independence......................................100

  4. Defendant Carter Further Lacks Independence. ....................................102

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

     5.     Defendant Meeker Further Lacks Independence. ................................... 105

     6.     Non-Defendant Eisen Further Lacks Independence. .............................. 106

**IX.**     **DAMAGES TO THE COMPANY** ............................................................ 108

**X.**     **CLAIMS FOR RELIEF** .......................................................................... 109

COUNT I: Violations of Section 14(a) of the Exchange Act ......................................... 109

COUNT II: Violations of Section 10(b) of the Exchange Act........................................ 111

COUNT III: Violations of Section 29(b) of the Exchange Act ...................................... 114

COUNT IV: Breach of Fiduciary Duty  (Against the Director Defendants) .................. 114

COUNT V: Breach of Fiduciary Duty  (Against the Officer Defendants) ..................... 115

COUNT VI: Breach of Fiduciary Duty for Insider Trading Under *Brophy* .................. 116

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff James Kelly ("Plaintiff"), by and through his undersigned attorneys, submits this Verified Shareholder Derivative Complaint ("Complaint") in the name and on behalf of nominal defendant Block, Inc. ("Block" or the "Company") against certain current and former Company officers and directors. Plaintiff bases his allegations upon personal knowledge as to his own acts and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes the review and analysis of Block's public filings with the United States Securities and Exchange Commission ("SEC"), news reports, press releases, publicly-filed complaints, other publicly available information, and books and records produced by the Company pursuant to 8 *Del. C.* § 220.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This is a shareholder derivative action brought on behalf of and for the benefit of Block against certain of its officers and/or directors named as defendants herein ("Individual Defendants") for (i) violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9; (ii) violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; (iii) violations of Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b); (iv) breaches of fiduciary duties; and (v) insider trading violations from February 2019 through the present (the "Relevant Period").

2.    Block, formerly Square, Inc., was co-founded by Jack Dorsey ("Dorsey") and James McKelvey ("McKelvey") in February 2009.  In 2013, the Company launched Cash App, which now offers a wide range of financial services to people over 13 years of age, including allowing users to transfer money in or out of the app, make purchases using a prepaid debit card linked to the user's account, invest in stocks or bitcoin, apply for personal loans, and more.

3.    Block has built Cash App on the bedrock of "frictionless onboarding," a process of intentionally seeking *minimum information* to sign on new customers.  To create a Cash App account, a potential user simply needs to download the app and enter either a phone number or an email address and a zip code.  No unique identifying information—such as bank account information or a Social Security number—is required.

4.     Block's valuation is highly dependent upon the steady increase of its user base. With this in mind, Block's fiduciaries have been laser-focused on expanding the number of Cash App users, and Block's "frictionless" business model purportedly helped to fulfill this objective – the Company's reported Cash App monthly actives grew from 17.6M in 2019 to over 53.1M in 2023.[1]

5.     However, Block's "frictionless" approach to onboarding not only maximized the creation of new customer accounts, whether or not they are actually reflective of additional customers, but also facilitated fraud and other criminal activity (i.e., money laundering, drug dealing and sex trafficking, etc.) by allowing bad actors to create an account (or multiple accounts) with just a phone number or an email address and a zip code.

6.     Despite awareness of the proliferation of illicit activity spanning from Block's "frictionless" onboarding, the Individual Defendants failed to ensure that the Company implemented compliance measures and managed the risks attendant to the Cash App platform, eschewing such measures in favor of the exponential growth of user account numbers.  For example, even when a user was caught engaging in fraud or other prohibited activity, Block would blacklist or deactivate the account without banning the user. Because the Individual Defendants were aware that blacklisted accounts were regularly associated with dozens or hundreds of other active accounts suspected of fraud, the Individual Defendants knowingly failed to stop fraudulent users from accessing the Cash App platform. Furthermore, while new user accounts on Cash App soared, the Individual Defendants failed to ensure that the Company concurrently grew its compliance program to manage risk.

7.     The books and records obtained by Plaintiff reveal that the Board of the Directors ("Board") was repeatedly made aware of the lack of effective compliance controls at the Company through a parade of red flags received over the course of years (*see infra* § IV.D), yet failed to

_____

[1] As discussed *infra* at Section IV.D.2.d., the Company inflated user metrics by changing its methodology for reporting user metrics from customer-based to account-based in Q4 2021, despite knowledge that many users had multiple accounts.

take any affirmative action to ensure that Block complied with its legal and regulatory obligations.

8.  For example, the Board and the Audit and Risk Committee were acutely aware that Block, for a period of years, failed to meet its regulatory obligations to "know your customer" in onboarding customer accounts; investigate customer complaints; detect and prevent fraud and other crimes from occurring on the platform; provide refunds to customers who have been wrongly denied funds; and otherwise provide an adequate level of customer service.  Instead, Block repeatedly incurred enormous compliance backlogs, outsourced core compliance functions, loosened compliance and risk measures to attain higher levels of growth, and relied on "machine learning" rather than appropriately fund its compliance program. As a result, fraud, crime, and other abuse proliferated on the platform while Block customers were often left without recourse. As a former Block employee would subsequently reveal, between 40% and 75% of all Cash App accounts were fake, involved in fraud, or duplicative accounts tied to a single individual.

9.  The extent of Block's woefully deficient compliance controls were partially revealed on March 23, 2023, when Hindenburg Research published a report titled "Block: How Inflated User Metrics and 'Frictionless' Fraud Facilitation Enabled Insiders To Cash Out Over $1 Billion" (the "Hindenburg Report").[2]  The Hindenburg Report, the culmination of a two-year investigation that involved dozens of interviews with former employees, partner and industry experts, as well as an extensive review of regulatory and litigation records and Freedom of Information Act (FOIA) and public records requests, alleges that Company wildly overstated its genuine user counts, allowed fraud and criminal activity to proliferate on the Cash App platform and maintained a "Wild West" approach to compliance.

10.  Subsequently, shareholders learned through the allegations of former employees that Block had no effective procedures to establish the identity of its customers and further suffered from widespread compliance lapses.  As *NBC News* reported on February 16, 2024, two whistleblowers who filed complaints with the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") attested that the Company "had no effective procedure to

---

[2] *See* Hindenburg Report, *available at* https://hindenburgresearch.com/block/.

establish the identity of its [Cash App] customers."[3] On May 1, 2024, *NBC News* further reported that federal prosecutors were digging into former employees' allegations of "widespread and yearslong compliance lapses" at the Company, which were seemingly known to Block's leadership and the Board.[4]

11.    On January 16, 2025, the CFPB issued a consent order against Block (the "CFPB Consent Order"), finding that Block failed to provide adequate customer service to the level that the Company had violated the Consumer Financial Protection Act of 2010 ("CFPA"), failed to take appropriate measures to prevent fraud on Cash App in violation of the CFPA, failed to fulfill its obligations to investigate and resolve disputes about unauthorized transactions in a timely manner, and failed to provide further appropriate fraud and error resolution measures for customers, also in violation of the CFPA.

12.    Shortly thereafter, on April 10, 2025, Block was also fined by the New York Department of Financial Services, which released the terms of its Consent Order with Block (the "NYDFS Consent Order").  The NYDFS Consent Order identified significant deficiencies with Block's financial controls, including with respect to Block's Know Your Customer practices, transaction monitoring practices, and suspicious activity reporting requirements during 2018 through at least 2021.  In connection with the NYDFS Consent Order, NYDFS Superintendent Adrienne A. Harris stated, "***[t]he rapid growth of Block's Cash App absent a robust compliance function created risk and vulnerabilities that violated the rules***…".

---

[3] Gretchen Morgenson, *Federal regulators are probing whether Cash App leaves door open to money launderers, terrorist*, NBC NEWS (Feb. 16, 2024), *available at* https://www.nbcnews.com/business/personal-finance/whistleblowers-cash-app-leaves-door-open-money-laundering-terror-rcna138958.

[4] Gretchen Morgenson, *Federal prosecutors are examining financial transactions at Block, owner of Cash App and Square*, NBC NEWS (May 1, 2024), *available at* https://www.nbcnews.com/business/personal-finance/prosecutors-examining-transactions-block-owner-cash-app-squarc-rcna147181.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

13.     Defendants also made fraudulent disclosures to the Company and its shareholders about the Company's compliance failures.  The Company's annual proxy statements discussed the Board's purported oversight of risk management, but failed to disclose the routine lapses in risk management that would later lead to government investigations that cost the Company hundreds of millions of dollars in civil penalties.  Defendants also made separate disclosures that misled the Company and its shareholders into believing that Defendants were focused on implementing a robust anti-fraud system.  For example, on February 24, 2022, Dorsey stated that Block "ha[s] limits in place to manage" fraud on Cash App and was "looking for opportunities to increase those."  At the time, as Defendants knew, Block was instead minimizing its compliance function to artificially inflate user metrics.

14.     The Individual Defendants' failure to ensure that Block complied with governing laws and regulations has exposed Block to reputational harm and has subjected the Company to multiple investigations by government agencies, adverse regulatory actions and penalties of more than $295 million.  In addition, the Company is also the subject of a costly securities fraud litigation in connection with misstatements concerning the wrongdoing alleged herein.

15.     Compounding the Board's failure to adequately oversee the Company's compliance and risk management systems, the Director Defendants turned a blind eye while the Company's two co-founding directors, Dorsey and McKelvey, collectively sold over $1 billion of Block stock at artificially inflated prices.

16.     Accordingly, Plaintiff brings this action on behalf of and for the benefit of Block to recoup the damages that the Company has suffered as a result of the Individual Defendants' failure to ensure that the Company maintained effective compliance and risk management systems and adhered to governing laws and regulations, for Dorsey and McKelvey's ill-gotten gains in appropriating and trading on the Company's material non-public information, and for Defendants' violations of federal securities laws. Plaintiff further seeks rescission of the contracts between Defendants and Block due to Defendants' violations of the Exchange Act while performing their job duties.

## II.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1331 because Plaintiff's claims raise federal questions under Sections 10(b), 14(a), and 29(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), and 78cc(b).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

19.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

20.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because the Defendants have been involved in business in this District and their actions have had an effect in this District. Additionally, the related Securities Class Action pursuing direct claims against the Company is pending in this District.

## III.    PARTIES

### A.    Plaintiff

21.    Plaintiff James Kelly is a current shareholder of Block, has been a shareholder of Block at all material times alleged in this Complaint, and will continue to be a shareholder of Block through the conclusion of this litigation.  Plaintiff will fairly and adequately represent the interests of other shareholders and the Company in enforcing its rights.

1

### B.     Current Director Defendants

2     22.     Jack Dorsey ("Dorsey") is a co-founder of the Company, has served as principal

3   executive officer and as a member of the Board of Directors since July 2009, and as Chairman of

4   the Board of Directors since October 2010.  Dorsey has also served as Chief Executive Officer

5   ("CEO") and President from July 2009 until the title of CEO was changed to Block Head in April

6   2022.  Dorsey has also served as Square Head since October 2023.

7     23.     James McKelvey ("McKelvey") is co-founder of the Company and has served on

8   the Company's Board of Directors since July 2009.

9     24.     Roelof Botha ("Botha") has served as a member of the Company's Board of

10   Directors since January 2011 and as Lead Independent Director since June 2022.  Botha is

11   currently a member of the Audit and Risk Committee, a position he has held since 2016.  He is

12   also a member of the Compensation Committee.

13     25.     Amy Brooks ("Brooks") has served as a member of the Company's Board of

14   Directors since October 2019.  She has also served as a member of the Nominating and Corporate

15   Governance Committees since October 2019.

16     26.     Shawn Carter ("Carter") has served as a member of the Company's Board of

17   Directors since May 2021.

18     27.     Paul Deighton ("Deighton") has served as a member of the Company's Board of

19   Directors since May 2016.  Deighton is currently the chair of the Audit and Risk Committee, a

20   position he has held since June 2022.  He has also served as a member of the Compensation

21   Committee since July 2016.

22     28.     Randal Garutti ("Garutti") has served as a member of the Company's Board of

23   Directors since 2017.  Garutti is currently a member of the Compensation Committee and is Chair

24   of the Nominating and Corporate Governance Committee.

25     29.     Mary Meeker ("Meeker") has served as a member of the Company's Board of

26   Directors since 2011.  Meeker is currently the Chair of the Compensation Committee.

27     30.     Dorsey, Botha, Brooks, Carter, Deighton, Garutti, McKelvey and Meeker are

28   collectively referred to herein as the "Current Director Defendants."

1

### C.    Former Director Defendants

2      31.    Anna Patterson ("Patterson") served as a member of the Company's Board of

3   Directors from November 2017 until June 2022.  Patterson was a member of the Audit and Risk

4   Committee from 2018 through 2022.

5      32.    Sharon Rothstein ("Rothstein") served as a member of the Company's Board of

6   Directors from January 2022 until June 18, 2024.  Rothstein was previously a member of the

7   Compensation Committee.

8      33.    Lawrence Summers ("Summers") served as a member of the Company's Board of

9   Directors from June 22, 2011 until February 8, 2024.  Summers was a member of the Audit and

10  Risk Committee from 2016 through 2023.

11     34.    David Viniar ("Viniar") served as a member of the Company's Board of Directors

12  from October 1, 2013 until June 2022.  Viniar served as the Chair of the Audit and Risk

13  Committee from 2016 through 2022.

14     35.    Darren Walker ("Walker") served as a member of the Company's Board of

15  Directors from June 16, 2020 until August 1, 2023.  Walker attended several Audit and Risk

16  Committee meetings throughout 2022, becoming an official member of the Audit and Risk

17  Committee in 2023.

18     36.    Patterson, Rothstein, Summers, Viniar and Walker are collectively referred to

19  herein as the "Former Director Defendants."

20  ### D.    Officer Defendants

21     37.    Amrita Ahuja ("Ahuja") has served as the Company's Chief Operating Officer

22  since February 2023, and as its Chief Financial Officer ("CFO") since January 2019.  As CFO,

23  Ahuja was present for a portion of every Board and Audit and Risk Committee meeting held

24  during the Relevant Period.

25     38.    Dorsey and Ahuja are collectively referred to herein as the "Officer Defendants."

26  ### E.    Nominal Defendant

27     39.    Block is a Delaware corporation that, according to its annual report, does "not

28  designate a headquarters location as it [has] adopted a distributed work model."  The Company's

principal executive offices are located in Oakland, California and the Company's Class A common stock trades on the NYSE under the symbol "XYZ."

### F.    Relevant Non-Parties

40.    Neha Narula ("Narula") has served as a member of the Company's Board of Directors since July 2023.  Narula is a member of the Audit and Risk Committee, as well as the Nominating and Corporate Governance Committee.

41.    Anthony Eisen ("Eisen") became a member of the Company's Board of Directors on February 6, 2025.  Eisen is the co-founder of Afterpay Limited ("Afterpay"), an Australian technology company that was acquired by Block on January 31, 2022.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background

#### 1.    Through "Frictionless" Onboarding, Block's Cash App Grows to Outperform its Inaugural Point-of-Sale Product.

42.    Founded in 2009 by Dorsey and McKelvey, Block (formerly Square, Inc.) is a financial services and digital payment company that was initially focused on providing point of sale systems for small- and medium-sized businesses to accept card payments through its Square payment processing system.  Block now calls this merchant side aspect of its business the Square ecosystem.

43.    The second main segment of Block's business is the Cash App ecosystem, a system of financial products and services aimed at consumers.  In 2013, Block launched Square Cash, later rebranded as Cash App, a payment service that allows users to send money to other users.  Over the years, Cash App built additional financial services into Cash App, including a debit card, investment platform for stocks and Bitcoin, savings, direct deposits, and other mobile banking services.

44.    One of the main advantages Cash App purports to enjoy over competition is the low costs required to attain new users.  As Dorsey explained during Block's Q2 2017 earnings call on August 2, 2017: "we're able to onboard individuals to [Cash App] with just a ZIP Code

and an email address or phone number."[5]  Dorsey claimed that Block was able to manage the risks that such low-information accounts posed, further stating, "[w]e've used machine learning and data science to manage risk since the beginning of Square.  We're constantly looking for ways to make our services more automated and more self-serve, and machine learning is perfect for that."[6] Block's reliance on machine learning, including for its compliance and risk management systems, would inure to the Company's detriment.

45.     During Block's Q3 2018 earnings call, Dorsey characterized Cash App's limited onboarding information as a "frictionless" approach, stating that the Company's "focus is really observing what our customers are doing and then taking as much friction out as possible, while adding some magic at the same time."[7]

46.     "Frictionless" onboarding became a central pillar in Block's business plans.  In 2019, Block touted the "frictionless onboarding" of Cash App users, whereby the Company sought as little information as possible from its new customers to focus on growth and acquisition of new customers at scale.

47.     Block's business model purportedly resulted in a large number of new user accounts.  The Company reported 24 million monthly actives in December 2019. And with the Company's Square business under threat due to closures from the COVID-19 pandemic, Cash App became increasingly important to the Company, as many merchants using Block's merchant services were forced to close their doors as the pandemic worsened.

48.     On March 27, 2020, federal COVID legislation, the Coronavirus Aid, Relief, and Economic Security Act (known as the "CARES Act"), was signed into law, providing expanded

---

[5] *See* Block's Q2 2017 Earnings Call Transcript (Aug. 2, 2017), *available at* https://seekingalpha.com/article/4094029-square-sq-q2-2017-results-earnings-call-transcript.

[6] *Id.*

[7] *See* Block's Q3 2018 Earnings Call Transcript (Nov. 7, 2018), *available at* https://seekingalpha.com/article/4219655-square-inc-sq-ceo-jack-dorsey-on-q3-2018-results-earnings-call-transcript.

1    unemployment insurance benefits to those affected by the COVID-19 pandemic.

2         49.    In response, Block sought to transform its Cash App platform into a distribution

3    system for pandemic relief.  One day before the CARES Act was signed into law, Dorsey tweeted,

4    "the technology exists to get money to most people today (even to those without bank

5    accounts)….US government: let us help."[8]

6         50.    Cash App shortly thereafter began to offer users the ability to sign up for COVID

7    relief payments through its platform.  Dorsey, through his Twitter account, personally promoted

8    Cash App as a tool whereby users could receive COVID-19 relief payments, "immediately," **and

9    with "no bank account needed**."[9]  About 11 million people activated the direct deposit feature

10   on their existing Cash App accounts, or set up new deposit-enabled accounts within weeks of

11   Dorsey's tweet, helping Block to increase its financial metrics throughout the pandemic.[10]  These

12   new transactions were an important pivot for Block, as COVID-19 posed an existential threat to

13   Block's commercial business as demand for point-of-sale systems decreased sharply.

14        51.    Cash App became Block's most important product as the COVID-19 pandemic set

15   in.  By the end of 2020, Cash App's gross profit was $1.2 billion, and was poised to surpass the

16   Company's merchant side business (i.e., Square), which accounted for $1.5 billion in profits but

17   was experiencing slowing growth from the previous year.  The Company also reported 36 million

18   monthly transacting active customers in December 2020.  From this point forward, the

19   Company's reported growth in Cash App monthly transacting users and gross profits would

20   outpace those of its Square merchant side business.

21

22   [8] Jeff Kauflin, *Fintech Says They Can Speed Up The Stimulus, If The Government Just Lets Them*,

23   FORBES (Mar. 31, 2020), https://www.forbes.com/sites/jeffkauflin/2020/03/31/fintechs-say-they-

24   can-speed-up-the-stimulus-if-the-government-just-lets-them/.

25   [9] *See* Hindenburg Report.

26   [10] *See* Block, Inc. Q1 2020 Earnings Call Transcript (May 6, 2020), *available at*

27   https://www.fool.com/earnings/call-transcripts/2020/05/06/square-inc-sq-q1-2020-earnings-call-

28   transcript.aspx.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

   **2.    As a Financial Institution, Block Is Subject to Various Record-Keeping and Reporting Requirements.**

3      52.    Block is registered as a "Money Service Business" with FinCEN, which subjects

4   the Company to certain record-keeping and reporting requirements.

5      53.    Among other things, FinCEN is responsible for enforcing compliance with the

6   Bank Secrecy Act. Under the Bank Secrecy Act, financial institutions, such as Block, are required

7   to assist U.S. government agencies in detecting and preventing money laundering.  To this end,

8   Block is required to establish a Bank Secrecy Act ("BSA") / Anti Money Laundering ("AML")

9   compliance program, including procedures for customer due diligence and the reporting of

10  suspicious activity.

11     54.    FinCEN sets baseline requirements for Know Your Customer ("KYC"), a set of

12  regulations and procedures to verify and authenticate a customer's identity to ensure that they are

13  not laundering money, committing fraud or financing terrorism through a financial institution.

14  Customer Due Diligence ("CDD") is a major part of meeting KYC standards whereby a company

15  assesses and evaluates a customer's risk level after collecting information used to verify the

16  individual's identity.

17     55.    The need for due diligence does not stop when a customer is onboarded. Ongoing

18  monitoring or Ongoing Customer Due Diligence ("OCDD") is necessary to ensure continued

19  compliance and detect suspicious activity.  If any questionable or abnormal behavior is uncovered

20  throughout the KYC procedure, the BSA requires the financial institution to report the suspicious

21  activity (i.e., money laundering, tax evasion, etc.) to FinCEN no later than 30 calendar days after

22  the date of initial detection constituting the basis for filing a suspicious activity report ("SAR").

23     **3.    Maintaining Effective Compliance Measures Is a "Mission Critical" Function for Block.**

24

25     56.    As set forth above and as the Company acknowledges in its Annual Report on

26  Form 10-K for the fiscal year ended December 31, 2020 ("2020 10-K"), filed with the SEC on

27  February 23, 2021, Block is subject to legal, regulatory and compliance risks, including extensive

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

regulation relating to banking and payment services.[11]  With respect to these legal, regulatory and compliance risks, the 2020 10-K discloses the following:

> We are subject to a wide variety of local, state, federal, and international laws, regulations, licensing schemes, and industry standards in the United States and in other countries in which we operate. **These laws, regulations, and standards govern numerous areas that are important to our business, and include, or may in the future include, those relating to or placing restrictions upon banking, lending, deposit-taking, cross-border and domestic money transmission, foreign exchange, payments services** (such as payment processing and settlement services), cryptocurrency, trading in shares and fractional shares, **consumer protection, anti-money laundering**, escheatment, international sanctions regimes, data privacy and security, and compliance with the Payment Card Industry Data Security Standard, a set of requirements designed to ensure that all companies that process, store, or transmit payment card information maintain a secure environment to protect cardholder data.[12]

57.    The 2020 10-K further provides:

> **[A]ny perceived or actual breach of compliance** by us with respect to applicable laws, rules, and regulations could have a significant impact on our reputation as a trusted brand and could cause us to lose existing customers, prevent us from obtaining new customers, require us to expend significant funds to remedy the problems caused by breached and to avert further breaches, and expose us to legal risk and potential liability.[13]

58.    The foregoing disclosures make it abundantly clear that effective compliance measures were a mission critical function of the Company, as the failure to maintain an effective compliance program could lead to severe consequences, including hefty fines, legal actions, reputational damage, loss of customers, and even criminal charges.

59.    The regulatory and reputational harm was especially acute for Cash App, as Block publicly touted its low-cost, "frictionless" method for opening new accounts while collecting minimal information about its users.

**B.    Duties of the Board of Directors and the Audit and Risk Committee**

**1.    Duties of the Board of Directors**

60.    According to each of the Company's Proxy Statements filed with the SEC between

---

[11] *See* 2020 10-K at 38.

[12] *Id.* (emphasis added).

[13] *Id.* (emphasis added).

the years 2018 and 2024 (the "Proxy Statements"), Block's Board of Directors "maintains ultimate responsibility for the [Company's] oversight of risk."[14] The Proxy Statements also provide that the Board "recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk-aware and accountable organization."[15]

61.     In addition, each of the Proxy Statements contains the same or substantially similar disclosure set forth in the 2024 Proxy Statement:

> As part of our overall risk management process, we conduct an annual Enterprise Risk Assessment ("ERA"), which is shared and discussed with our board of directors. Oversight of the ERA is supported and enabled by our audit and risk committee. Our board of directors' oversight of the ERA framework includes a routine evaluation, with discussions with key management and outside advisors, as appropriate, of the processes used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's implementation and measurement of risk tolerances, limits and mitigation. Our board of directors, management and functional leaders of our ERA define our primary risk focus areas for review. These areas include strategic, operational, people, financial and compliance. We address risks such as cybersecurity, financial reporting and competition within each of these areas.[16]

62.     The Proxy Statements also establish the following as the "Primary Areas of Risk Oversight" attributed to the Full Board of Directors:

> Strategic, financial and execution risks and exposures associated with our business strategy, policy matters, succession planning, data privacy, data security, and cybersecurity, significant litigation and regulatory exposures and other current matters that may present material risk to our financial performance, operations, infrastructure, plans, prospects or reputation, acquisitions and divestitures and our operational infrastructure.[17]

63.     In addition to the duties outlined in the Proxy Statements, the Board is also duty bound to ensure the Company complies with applicable laws and regulations governing money

---

[14] *See e.g.*, Block.com Proxy Statement (Schedule 14A), filed with the SEC on Apr. 26, 2024 (2024 Proxy), at 10.

[15] *Id.*

[16] *Id.*

[17] *Id.* at 11.

laundering and other financial crimes. The BSA requires financial institutions to maintain an AML program and FinCEN has issued regulations specifying the requirements of such programs. To this end, the Company has established a Bank Secrecy Act / Anti-Money Laundering Policy ("BSA/AML Policy") in order to ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████[18]

64.     Although the Board has appointed members of the Audit and Risk Committee to assist with overseeing the Company's compliance with applicable law (including federal securities laws and other legal and regulatory requirements), ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████[19] ██████████████████████████████████████████████ ███████████████████████████[20] The Board of Directors is further charged with reviewing the BSA/AML Policy annually. As result, the Board members know or have reason to know of the Company's continued obligations to institute and maintain effective measures to ensure that the Company is complying with applicable laws and regulations regarding anti-money laundering and other financial crimes.

## 2.     Duties of the Audit and Risk Committee

65.     Block's Proxy Statements establish the following as the "Primary Areas of Risk Oversight" attributed to the Audit and Risk Committee:

> Risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, our programs and policies relating to legal and regulatory compliance, and operational security and reliability. In addition, our audit and risk committee assists our board of directors with oversight of certain matters related to privacy, data security and

---

[18] BlockKelly0000000041-0043.

[19] *See* BlockKelly0000000041-0042.

[20] BlockKelly0000000058.

cybersecurity.[21]

66.    Additional responsibilities of the Audit and Risk Committee are set forth in Audit and Risk Committee Charter (the "ARC Charter").  Pursuant to the ARC Charter, the purpose of the Audit and Risk Committee is to assist the Board in overseeing the following:[22]

- The Company's accounting and financial reporting processes and internal controls as well as the auditing and integrity of the Company's financial statements;

- The qualifications and independence of the Company's independent registered public accounting firm (the "Independent Auditor");

- The performance of the Company's Independent Auditor and internal audit function;

- The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements); and

- Risk assessment and risk management pertaining to the financial, accounting and tax matters as well as data privacy and cybersecurity needs of the Company.

67.    With respect to "Legal and Regulatory Compliance," the ARC Charter states the Audit and Risk Committee shall:

- Oversee the review of any complaints and submissions that have been brought to the Audit and Risk Committee by the Company's Chief Legal Officer or Chief Compliance Officer (or equivalent titles thereof) under the Company's Code of Business Conduct and Ethics (the "Code");

- Review and discuss with management and the Independent Auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including compliance with the Foreign Corrupt Practices Act and foreign anti-corruption laws, and compliance with export control regulations, (ii) any reports received through the Company's reporting hotline and (iii) reports regarding compliance with applicable laws, regulations and internal compliance programs in each case to the extent pertaining to financial, accounting and/or tax matters;

---

[21] 2024 Proxy at 11.

[22] *See* Charter of the Audit and Risk Committee of the Board of Directors of Block, Inc. (effective as of Nov.18, 2015; as last amended on Oct. 24, 2024), *available at* https://s29.q4cdn.com/628966176/files/doc_governance/2024/10/Block-Inc-Audit-and-Risk-Committee-Charter-Oct-2024.pdf.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Discuss with management and the Independent Auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies; and

- Discuss with the Company's Chief Legal Officer legal matters that may have a material impact on the financial statements or the Company's compliance procedures that pertain to financial, accounting or tax matters of the Company.

68.    With respect to "Risks," the ARC Charter sets forth the following responsibilities:

The Audit and Risk Committee shall review and discuss with management and the Independent Auditor the Company's major financial and other risk exposures, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, the Company's programs, policies relating to legal and regulatory compliance, and operational security and reliability, and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management. The Audit and Risk Committee will also review the Company's risk management framework, programs, and policies, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees.

69.    The ARC Charter further provides that:

The Audit and Risk Committee shall report regularly to the Board with respect to the Audit and Risk Committee's activities, including any significant issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements or the performance and independence of the Independent Auditor, as applicable.

70.    With respect to the foregoing, Block's Audit and Risk Committee ██████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████[23]

**C.    Defendants Repeatedly Made False Assurances to Shareholders Concerning the Company's Comprehensive Compliance Measures.**

71.    Defendants made numerous false and misleading statements throughout the Relevant Period to assure shareholders of the Company's comprehensive compliance measures during the period of Cash App's exponential growth, as set forth in the Company's SEC filings and other public disclosures.

72.    Block's Form 10-Ks are signed by the Officer Defendants and each member of the

---

[23] *See, e.g.*, BlockKelly0000000427, BlockKelly0000000622.

Board. Block's Form 10-Qs are signed by the Officer Defendants. Additionally, the Audit and Risk Committee reviews each of the Company's financial statements.

73.    On February 26, 2020, Block filed its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2019 ("2019 10-K"), which represented that that the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and which also stated that the Block "vet[s] and monitor[s] [its] customers and the payments transactions [it] process[es] for them as part of [the Company's] risk management efforts."[24]  The 2019 10-K further represented that the Company had implemented an effective anti-money laundering ("AML") program designed to prevent money laundering, terrorist financing, and other illicit activity, stating as follows:

> We are subject to anti-money laundering (AML) laws and regulations in the United States and other jurisdictions.  **We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity.**  Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities.  Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.[25]

74.    On May 6, August 5 and November 5, 2020, Block filed its quarterly reports on Form 10-Q with the SEC for the first, second and third fiscal quarters of 2020, respectively, which were signed by Dorsey and Ahuja, and which stated that the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and that Block "vet[s] and monitor[s] [its] customers and the payments transactions [it] process[es] for them as part of [the Company's] risk management efforts."[26]

---

[24] *See* 2019 10-K at 21, 31.

[25] *Id.* at 13 (emphasis added).

[26] *See* Form 10-Q for the quarterly period ended Mar. 31, 2020, filed with the SEC May 6, 2020, at 61, 71; Form 10-Q for the quarterly period ended June 30, 2020, filed with the SEC Aug. 5,

75.     On January 4, 2021, Dorsey signed a public comment letter opposing proposed FinCEN regulations to enhance Know Your Customer ("KYC") and due diligence requirements for the processing of cryptocurrency transactions, arguing that "people should have the ability to participate in financial systems easily and equitably," and that stricter regulations were not necessary because private sector solutions, such as those offered by Block, have proved extraordinary effective in mitigating risks.[27] The release claimed the Company had "invested substantially in the health of its ecosystem from a product, leadership, innovation, and legal perspective" rendering the proposed rules "unnecessary." The release further claimed that the proposed rules would actually increase the risk of illicit activities and that "private sector solutions and companies" such as those offered by Block were better at mitigating risks. The release continued: "Flexible, risk-based regulation allows compliance programs to be more comprehensive and actually mitigate risk using tools that are compatible with blockchain technology" and that the Company was purportedly "able to use data that is available through blockchain analysis to identify signals of unlawful activity." According to the release, Block's efforts and coordination with regulators had "prove[n] extraordinarily effective in identifying and stopping illicit activities."

76.     On February 23, 2021, Block filed its 2020 10-K, which was signed by Dorsey and Ahuja, and which contained the same assurances found in the 2019 10-K about Block's compliance program, vetting and monitoring customers and implementing an effective AML

_____

2020, at 64, 74; and Form 10-Q for the quarterly period ended Sept. 30, 2020, filed with the SEC Nov. 5, 2021, at 67, 75.

[27] *See* Square, Inc.'s Federal Comment Letter Regarding FinCEN's Proposed Rulemaking on Requirements for Certain Transactions Involving Convertible Virtual Currency of Digital Assets (Jan. 4, 2021), https://investors.block.xyz/investor-news/news-details/2021/Square-Incs-Federal-Comment-Letter-Regarding-FinCENs-Proposed-Rulemaking-on-Requirements-for-Certain-Transactions-Involving-Convertible-Virtual-Currency-or-Digital-Assets/default.aspx

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

program.[28]

77.     On May 6, August 2, and November 4, 2021, Block filed its quarterly reports on Form 10-Q with the SEC for the first, second and third fiscal quarters of 2021, respectively, which were signed by Dorsey and Ahuja, and which stated that the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and that Block "vet[s] and monitor[s] [its] customers and the transactions [it] process[es] for them as part of [the Company's] risk management efforts."[29]

78.     On February 24, 2022, Block held a conference call during which Dorsey claimed that the Company was focused on preventing fraud on Cash App, stating, in part:[30]

> Well, ***I'll say that I think our biggest constraint right now is just how we think about building Cash App's risk and compliance efforts, everything that we see around fraud***. We want to make sure that we are building a system that is scalable, that allows for limits for customers who might have more resources at their disposal and want to use Cash App for more and more things such as – as they would treat their normal bank.
>
> ***So we have limits in place to manage all these things, and a big goal for us is to make sure that we're looking for opportunities to increase those and to, at the same time, maintain all of the risk controls and fraud and continue to do what we've done so well over the years. And not just on the Cash App side, but on the Square side, keep it in our business forever***.

79.     Also on February 24, 2022, Block also filed its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2021 ("2021 10-K"), which was signed by Dorsey and Ahuja, and which contained the same assurances found in the 2019 and 2020 10-Ks about

---

[28] *See* 2020 10-K at 14, 29, 38.

[29] *See* Form 10-Q for the quarterly period ended Mar. 31, 2021, filed with the SEC May 6, 2021, at 73, 82; Form 10-Q for the quarterly period ended June 30, 2021, filed with the SEC Aug. 2, 2021, at 78, 88; and Form 10-Q for the quarterly period ended Sept. 30, 2021, filed with the SEC Nov. 4, 2021, at 80, 90.

[30] *See* Block's Q4 2021 Earnings Call Transcript (Feb. 24, 2022) (emphasis added), *available at* https://seekingalpha.com/article/4490263-block-inc-s-sq-ceo-jack-dorsey-on-q4-2021-results-earnings-call-transcript.

Block's compliance program, vetting and monitoring customers and implementing an effective AML program.[31]

80.    On May 5, August 4, and November 3, 2022, Block filed its quarterly report on Form 10-Q with the SEC for the first, second and third fiscal quarters of 2022, respectively, which were signed by Dorsey and Ahuja, and which stated that the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and that Block "vet[s] and monitor[s] [its] customers and the transactions [it] process[es] for them as part of [the Company's] risk management efforts."[32]

81.    On February 23, 2023, Block filed its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2022 ("2022 10-K"), which was signed by Dorsey and Ahuja, and which contained the same assurances found in the 2019, 2020 and 2022 10-Ks about Block's compliance program, vetting and monitoring customers and implementing an effective AML program.[33]

82.    These statements were all false and misleading, because (as discussed herein) for a period of years Defendants failed to correct identified compliance deficiencies, including the failure to maintain an effective compliance and risk management system to adhere to governing laws and regulations.  Each of these statements was materially false in that it failed to disclose that the Company continuously loosened its risk tolerances in order to accelerate Cash App growth, including the onboarding of Cash App users without requisite identity verification, and further including the proliferation of fraud and other criminal activity facilitated by the Cash App platform, including insurance fraud, scams and account takeovers, money laundering, gambling,

_____

[31] *See* 2021 10-K at 15, 30, 41.

[32] *See* Form 10-Q for the quarterly period ended Mar. 31, 2022, filed with the SEC May 5, 2022, at 82, 93; Form 10-Q for the quarterly period ended June 30, 2022, filed with the SEC Aug. 4, 2022, at 85, 96; and Form 10-Q for the quarterly period ended Sept. 30, 2022, filed with the SEC Nov. 3, 2022, at 87, 98.

[33] *See* 2022 10-K at 20, 38, 50.

drug dealing, sex trafficking, and organized crime.

**D.    The Individual Defendants Failed to Correct Identified Compliance Deficiencies Despite Numerous Red Flags.**

83.    Given that maintaining effective compliance measures to ensure that Block knew its customers, administered its customers' Cash App accounts in a manner to ensure that such accounts remained secure, and to take measures to otherwise ensure that Block did not facilitate criminal activity through its banking systems is a mission critical function for Block, the Board had a duty to ensure that the Company maintained effective compliance and risk management systems and adhered to governing laws and regulations.  The books and records obtained by Plaintiff in this action, ████████████████████████████████████████

████████████████████████.

84.    The books and records demonstrate that ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

85.    Block's widespread governance failures were not an accident, but rather the result of an intentional business plan to turn a blind eye to the red flag warnings of fraud, crime, and other abuse of the Cash App platform in exchange for continued growth of Block's reported Cash App user metrics.   Block's "magic" was not innovation, but instead Block embracing non-compliance as a tactic to grow user metrics.

### 1.    Suspicious Activity Reports Ballooned Throughout the Relevant Period.

86.

87.

| Bates Number of ARC Pre-Read Materials | Date Information Received by ARC | Reporting Period | Total SARs Filed |
|---|---|---|---|
| BlockKelly0000003310 | ▮▮▮ | ▮▮▮ | ▮▮ |
|  |  | ▮▮▮ | ▮▮ |
|  |  | ▮▮▮ | ▮▮ |
| BlockKelly0000002678 | ▮▮▮ | ▮▮▮ | ▮▮ |
| BlockKelly0000002697 | ▮▮▮ | ▮▮▮ | ▮▮ |

| | | | | |
|---|---|---|---|---|
| BlockKelly0000002707 | ████ [34] | | ████ | ████ |
| BlockKelly0000002718 | ████ [35] | | ████ | ████ |
| BlockKelly0000002732 | ████ | | ████ | ████ |
| BlockKelly0000002753 | ████ | | ████ | ████ |
| BlockKelly0000002769 | ████ | | ████ | ████ |
| BlockKelly0000003324 | ███ | | ████ | ████ |
| BlockKelly0000002800 | ███ | | ████ | ████ |
| BlockKelly0000002866 | ███ [36] | | ████ | ████ |
| BlockKelly0000002866 | ██ [37] | | ████ | ████ |
| BlockKelly0000002866 | ███ | | ████ | ███ |
| BlockKelly0000002883 | ███ | | ████ | ████ |
| BlockKelly0000002913 | ███ | | ████ | ████ |
| BlockKelly0000002955 | ███ | | ████ | ████ |
| BlockKelly0000002932 | ███ | | ████ | ███ |

88.  ██████████████████████████

████████████████████████████

███ ████████████████████████

████████████████████████████

███████████████

- **Q4  2018**: ████████████████
  ███████████████████ [8]

- **Q1 2019**: █████████████████
  █████████████████

———————————————

[34] As discussed *infra* ¶¶ 101-102, ████████████

████████████████████████████

████████████ BlockKelly0000002707.

[35] ██████████

[36] ████████████████████████████

████████████ *See* BlockKelly0000002866.

[37] ████████████████████████████

████████████ *See* BlockKelly0000002866.

[38] BlockKelly0000003311.

█████████████████████████[39]

- **Q2 2019**: ███████████████
███████████████████████████
███████████████████████████
███████████████[40]

- **Q3  2019**: ███████████████
███████████████████████████
███████████████████████████
███[41]

- **Q4  2019**: ███████████████
███████[42]

- **Q1 2020**: ███████████████
████████[43]

- **Q2 2020**: ███████████████
█████████[44]

- **Q3 2020**: █████████████[45]

- **Q4 2020**: █████████████[46]

- **Q1 2021**: "█████████████[47]

---

[39] BlockKelly0000002678.

[40] BlockKelly0000002697-2698.

[41] BlockKelly0000002708.

[42] BlockKelly0000002719.

[43] BlockKelly0000002733

[44] BlockKelly0000002753-2755.

[45] BlockKelly0000002771.

[46] BlockKelly0000003324.

[47] BlockKelly0000002800. The Company stopped reporting the percentage of SAR  filings that were Cash App specific following its report on Q1 2021, instead reporting *only* the SAR filings for Cash App.

2.     **The Individual Defendants Refused to Implement Adequate Legal Compliance and Risk Oversight at the Company Despite Years of Red Flags Indicating Woefully Deficient Systems.**

a.     **Cash App Experiences Tremendous Growth.**

89.     ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████[48]███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████[49]

90.     ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████[50]███████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████[51]

91.     ████████████████████████████████████████

████████████████████████████████████████████████

_____

[48] BlockKelly0000003307; BlockKelly0000002256; *see also* BlockKelly0000002267 ████

██████████████████████████████████████

[49] BlockKelly0000002257.

[50] BlockKelly0000000001; BlockKelly0000002256.

[51] BlockKelly0000002257; *see also* BlockKelly0000000003 (████████████████████████

████████████████████████████████████████████████

██████████████████████████).

| Bates Number of Pre-Read Materials | ███████ | ██████ | ████████ |
|---|---|---|---|
| BlockKelly0000002264 | ██████ | ███ | ███ |
| BlockKelly0000002278 | ███ | ███ | ███ |
| BlockKelly0000002290 | ██████ | ███ | ███ |
| BlockKelly0000002296 | ██████ | ███ | ███ |
| BlockKelly0000002301 | ██████ | ███ | ███ |
| BlockKelly0000002658 | ██████ | ███ | ███ |
| BlockKelly0000002311 | ██████ | ███ | ███ |
| BlockKelly0000002321 | ██████ | ███ | ███ |
| BlockKelly0000002327 | ██████ | ███ | ███ |
| BlockKelly0000002352 | ██████ | ███ | ███ |
| BlockKelly0000002360 | ██████ | ███ | ███ |
| BlockKelly0000002368 | ██████ | ███[52] | ███ |
| BlockKelly0000002382 | ██████ | ███ | ███ |
| BlockKelly0000002408 | ██████ | ███ | ███ |
| BlockKelly0000002414 | ██████ | ███ | ███ |
| BlockKelly0000002432 | ██████ | ███ | ███ |
| BlockKelly0000002440 | ██████ | ███ | ███ |
| BlockKelly0000003294 | ██████ | ███ | ███ |

**b.** ███████████████

██████████████

██████████

███████████████

████████ **Instead of Scaling Its Compliance Program to Meet Customer Growth.**

92. According to Block, "[k]now-your-customer (KYC) is a mandatory form of customer verification that allows service providers to know who their customers are and the level of risk they represent…KYC is one of the finance industry's most effective tools in combating financial crime."[53]

---

[52] ███████████████

███████████

[53] *See* Block Glossary, *available at* https://squareup.com/gb/en/glossary/know-your-customer.

93. 

94.

95.

_____

[54] BlockKelly0000001397.

[55] BlockKelly0000003306.

[56] BlockKelly0000003307.

[57] *Id.*

96. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████[58] ██████████████████████████████████

██████████████████[59] ██████████████████████

███████████[60]

97. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████[61] █████████

████████████████████████████████████████████

████████████████████████████[62]

98. ███████████████████████████████████

████████████████████████████████████████████

██████ █████████████████████████████████████

████████████████████████████████████████████

_____

[58] BlockKelly0000002675.

[59] *Id.*

[60] *Id.*

[61] BlockKelly0000002675-2676.

[62] *Id.*; *see also* BlockKelly0000001449 (███████████████████████

███████████████████████████).

1   ████[63]████████████████████████████████████████████████

2   ████████████████████████████████████████████████████████

3   ██████████████[64]███████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ███████████[65]████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████[66]

9   **Block's Compliance Program Fails to Keep Pace with Growing Fraud on Cash App,**

10  ████████████████████████████████████████████████████████

11  █████████████

12       99.   ████████████████████████████████████████████████

13  ██████████████████████[67]████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ██████████████████████[68]████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ███████████████████████████[69]

18       100.  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

_____

[63] BlockKelly0000000017.

[64] BlockKelly0000002642-2648.

[65] BlockKelly0000002651; BlockKelly0000000017.

[66] BlockKelly0000002652-2653.

[67] BlockKelly0000002675-2676.

[68] BlockKelly0000002692.

[69] BlockKelly0000002693.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    ███████████████████████████████████████████████ [70]

2    101.    ███████████████████████████████████████

3    ████████████████████████████████████████████████

4    ████████████████████████████████████

5    ███████████████████████████████████████████

6    ███████████████████████████████████████████

7    ████ [1]

8    102.    ████████████████████████████████████████

9    ████████████████████████████████████████████████

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ███████████ [72]

15   103.    ████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████ [73]

20   104.    ████████████████████████████████████████

21   _____

22   [70] BlockKelly0000002694.

23   [71] BlockKelly0000002704.

24   [72] BlockKelly0000002707.

25   [73] BlockKelly0000002703. ███████████████████████

26   ████████████████████████████████████████████████

27   ████████████████████████████████████████████████

28   ███████████████████████████ *Id.*

1

2 [74]

3

4 [75]

5

6 [76]

7

8

9

10    105.

11

12

13

14

15

16 [77]

17    106.

18

19

20 [78]

21

22

23

─────────────────

24 [74] BlockKelly0000002705.

25 [75] *Id.*

26 [76] *Id.*

27 [77] BlockKelly0000001633.

28 [78] BlockKelly0000002708.

1    ████████████████████████████████████████████████

2    ████████████[79]

3    107.   ███████████████████████████████████████████

4    ████████████████████████████████████████████████

5    ████████████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ██████████████████████████████[80] ████████████████

8    ████████████████████████████████████████████████

9    ██████████████████████████████████████[81] █ █████

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ███████████████████████

13   108.   ███████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ██████████████████████[82] ██████████████████████████

16   ████████████████████████████████████[83]

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ███████████

20   109.   ███████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ─────────────────────

24   [79] BlockKelly0000002707.

25   [80] BlockKelly0000002285-2286.

26   [81] BlockKelly0000002287.

27   [82] BlockKelly0000000072.

28   [83] *Id.*

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████[84]████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 █████████████████████████[85]

8 110. ██ ████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████[86] ██

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ██████████████[87]

15 111. ██████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

---

[84] BlockKelly0000002716.

[85] BlockKelly0000002717.

[86] *Id.*

[87] *Id.*

[88] BlockKelly0000002719.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



112. ██████████████████████████████████

113. ██████████████████████████████████

---

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] BlockKelly0000001745; BlockKelly0000001747.

[93] BlockKelly0000000167.

[94] BlockKelly0000002293.



114. ████████████████████████████████████

115. ████████████████████████████████████

116. ████████████████████████████████████

---

[95] BlockKelly0000002726-2727.

[96] BlockKelly0000002727.

[97] *Id.*

[98] BlockKelly0000002728.

117. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████[99]████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████

118. ████████████████████████████████████
███ ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████[100]
████████████████████████████████████████████

---

[99] BlockKelly0000002733.

[100] BlockKelly0000000180; BlockKelly0000002568.

1   ████████████████████████████████████████████████████

2   ████████████████████████████████████████████████████

3   █████████████████████████████████[101]

4   119.  ████████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████[102]████████████████████████████

7   ████████████████████████████████████████████████████

8   ███████████████████████[103]

9   120.  ████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  █████████████████████████████████  ██████████████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ██████████████████████████████████████[104]

16  121.  ████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ██████████████████████████████[105]  ██  █████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████[106]  ███████

21  ████████████████████████████████████████████████████

22  _____

23  [101] BlockKelly0000002299.

24  [102] BlockKelly0000002746.

25  [103] *Id.*

26  [104] BlockKelly0000002747.

27  [105] BlockKelly0000002748-2749.

28  [106] BlockKelly0000002749.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



122.

---

[107] *Id.*

[108] BlockKelly0000002754.

[109] BlockKelly0000002752.

[110] *Id.*

1  ███████████████████████████████████████████

2  ███████████████████

3      123.  ████████████████████████████████

4  ███████████████████████████████████████████

5  ███████████████████████████████████████████

6  ███████████████████████████████████████████

7  █████████████████████[111] ███████████████████████

8  ███████████████████████████████████████████

9  ███████████████████████████████████[112]

10      124.  ████████████████████████████████

11  ███████████████████████████████████████████

12  ███████████████████████████████████████████

13  █████████[113]

14  ███████████████████████████████████████████

15  █████████████████████[114]

16      125.  ████████████████████████████████

17  ███████████████████████████████████████████

18  ███████████████████████████████████████████

19  ██████████████████[115] ██████████████████████████

20  ███████████████████████████████████████████

21  ███████████████████████████████████████████

22  ███████████████████████████████████████████

---

[111] BlockKelly0000000424; BlockKelly0000002305.

[112] BlockKelly0000002310.

[113] BlockKelly0000002305.

[114] *Id.*

[115] BlockKelly0000002306.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



126.

127.

---

[116] BlockKelly0000002311; BlockKelly0000002313.

[117] BlockKelly0000001839; BlockKelly0000002760.

[118] BlockKelly0000002760.

[119] *Id.*

[120] *Id.*

[121] BlockKelly0000002762.

1

128. ████████████████████████████████████████████

2

█████████████████████████████████:[122]



---

[122] BlockKelly0000002767; BlockKelly0000002770.

**Failure to Detect and Prevent Fraud or Respond to Customers**

129.    In addition to being exposed to repeated red flags showing ██████████ ██████████████████████████████████████████████████████████ ████████████████████████████████ the full Board also continued to receive red flag warnings that █████████████████████████████████ ████████

130.    █████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████[123] █████████████████████████████ ████████████████████████████████████████[124] ██████████ ████████████████████████████████████████████████████████ █████████████████████████████████████[125] ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████[126]

131.    █████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████[127] ████████ ████████████████████████████████████████████████████████



---

[123] BlockKelly0000002319.

[124] *Id.*

[125] *Id.*

[126] BlockKelly0000002320.

[127] BlockKelly0000002319.

[128]

[129]

132. ███████████████████████████

c. **Regulators Investigate the Company's Compliance Failures as the Board Is Informed of "**████████**" Concerns with its Compliance and Infrastructure.**

133. ███████████████████████████

[130]

[131]

---

[128] *Id.*

[129] BlockKelly0000002325.

[130]  BlockKelly0000001936. ████████████████████

██████████████████████████  ████████

█████████████████████████████████

█████████████████████  *See* BlockKelly0000000563-64. ███

█████████████████████████████████

█████████████████████████████████

████████████████████████

[131] BlockKelly0000003325.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



134.

[132]

---

[132] BlockKelly0000000562.

1 ███████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████ [133] █████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ███████████████████████████████ [134] ██████

8 ████████████████████████████████████████████

9 ████████████████████████████████

10 135. ████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████

13 █████████████ [135] █████████████████████████

14 ████████████████████████████████████████████

15 ██████████████████████████ [136] ███████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████████████

18 █████████████████ [137]

19 136. ████████████████████████████████████

20

21

22

23

---

24 [133] BlockKelly0000002336.

25 [134] BlockKelly0000002330.

26 [135] BlockKelly0000001975.

27 [136] *Id.*

28 [137] BlockKelly0000002795.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



137.

138.

139.

140.

---

[138] BlockKelly0000002799.

[139] BlockKelly0000002346-2347.

[140] BlockKelly0000002346.

[141] BlockKelly0000002347.

[142] BlockKelly0000002357.

[143] BlockKelly0000002348.

1    ████████████████████████[144]████████████████████████████████████████

2    ██████████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████[145]████████████

4    ██████████████████████████████████████████████████████████████████████

5    ██████████████████████████████████████████████████████████████████████

6    ██████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████[146]████████████

8    141.    ████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████[147]████████████

13   ██████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████[148]████████████████████

15   ██████████████████████████████████████████████████████████████████████

16   ████████[149] That it took the Company over a year and a half to identify this issue is inexcusable.

17   142.    ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████[150]████████

19   _____

20   [144] BlockKelly0000002350.

21   [145] BlockKelly0000002821.

22   [146]  BlockKelly0000002360. *See also* BlockKelly0000002363 ████████████████

23   ██████████████████████████████████████████████████████████████████████

24   ████████████████████████████████). 

25   [147] BlockKelly0000002825.

26   [148] *Id.*

27   [149] BlockKelly0000002358.

28   [150] BlockKelly0000002825.

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ██████████████████[151]

5      143.   ████████████████████████████████████████

6 ████████████████████████[152]

7 ████████████████████████████████████████████████████

8 ████████

9      144.   ████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 █████████████████████████[153] ██████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ██████[154] ██████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ███████████████████[155] ████████████████████████████

17 ████████████████████████████████████████████████[156]

18      **d.     The Board Knows that Cash App Users** ████████

19 ████████████████████████████████████████████████████

20 ████████

21      145.   ████████████████████████████████████████

22 _____

23 [151] *Id.*

24 [152] BlockKelly0000002822.

25 [153] BlockKelly0000002366.

26 [154] *Id.*

27 [155] *Id.*

28 [156] *Id.*

146. [redacted][157]

147. [redacted][158]

148. [redacted][159]

[redacted][160]

[redacted][161]

---

[157] BlockKelly0000002688.

[158] BlockKelly0000002719

[159] BlockKelly0000000621.

[160] BlockKellly0000002860.

[161] BlockKellly0000002860.



149.     By reporting the number of accounts, as opposed to the number of unique users, the Company purposefully inflated its user metrics, as was later revealed in the Company's Response to the Hindenburg Report.  As set forth *infra* ¶ 205, of the 51 million monthly transacting activities reported for December 2022, only 44 million were connected to an identity verified through the Company's identify verification (IDV) program, and that of those 44 million verified accounts, only 39 million were attributable to a unique Social Security number.

**e.     The ARC Learns of the Company's**



150.

151.

---

[162] BlockKelly0000002866.

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.*

████████████████████████████████████████████████████

██████████████████████████████████████ [167]

152.  ██████████████████████████████████████████████

██████ [168] ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ [169]  █████

████████████████████████████████████████████████████

██████████ ██████ [170]  ██████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ [171]

153.  ██████████████████████████████████████████████

██████████████████████████ [172]  ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ [173]  ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ [174]  ██████████████████████████████

████████████████████████████████████████████████████

_____

[167] BlockKelly0000003214; BlockKelly0000003218.

[168] BockKelly0000002136.

[169] BlockKelly0000002883.

[170] *Id.*

[171] BlockKelly0000002411.

[172] BlockKelly0000002144.

[173] BlockKelly0000002892.

[174] *Id.*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    █████████████████████████████████████████████████████ [175]

2    154.  █████████████████████████████████████████

3    ███████████████████████████████████████████████████████

4    ████████████████████████████████████████████ [176] ████

5    ███████████████████████████████████████████████████████

6    ███████████████████████████████████████████████████████

7    ███████████████████████████████████████████████████████

8    ████████████████████ [177] ██████████████████████████████

9    ███████████████████████████████████████████████████████

10   ███████████████████████████ [178]

11   **f.**     ███████████████  **Persist into 2023.**

12   155.  █████████████████████████████████████████

13   ███████████████████████████ [179] ████████████████████████

14   ███████████████████████████████████████████████████████

15   ████████████ [180]

16   156.  █████████████████████████████████████████

17   ███████████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████

19   ███████████████████████████████████████████████████████

20   ███████████████████████████████████████████████████████

21   ███████████████████████████████████████████████████████

22   _____

23   [175] BlockKelly0000002911.

24   [176] BlockKelly0000000789.

25   [177] BlockKelly0000002416-2417.

26   [178] BlockKelly0000002952.

27   [179] BlockKelly0000002243.

28   [180] BlockKelly0000002919.



157.

158.

159.

---

[181] *Id.*

[182] *Id.*

[183] BlockKelly0000002919.

[184] BlockKelly0000002921.

[185] BlockKelly0000002927.

g.    **The Board Was Aware of** ▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓.

160.    Throughout the Relevant Period, the Board was made aware of ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓

161.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓[186]▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓[187]▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓[188]▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓[189]

162.    ▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓[190]▓▓

▓▓▓▓▓▓▓▓▓▓[191]

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[186] BlockKelly0000001491; BlockKelly0000002688.

[187] BlockKelly0000002692.

[188] *Id.*

[189] BlockKelly0000002688.

[190] BlockKelly0000002279.

[191] BlockKelly0000000066.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

[192]

163. █████████████████████████████

████████████████████████████████

████████████████████████████████

█████████████████████████████ [193] ████████

████████████████████████████████

████████████████████████████████

██████ [194]

164. █████████████████████████████

████████████████████████████████

████████████ [195]

165. █████████████████████████████

████████████████████████████████

████████████████████████████████

███████████ [196] ████████████████

████████████████████████████████

█████████████ [197]

166. █████████████████████████████

████████████████████████████████

████████████████████████████████

---

[192] BlockKelly0000000066; BlockKelly0000002281.

[193] BlockKelly0000002281-82.

[194] BlockKelly0000002282.

[195] BlockKelly0000001793.

[196] BlockKelly0000000419. █████████████████████

███████████████ BlockKelly0000001828-1830, BlockKelly0000002745.

[197] *Id.*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

███████████████████████████████████████████████

████████ [198]

167.    ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████ [199] ██████████████████████████████

██████████████████████████████████████████████ [200]

168.    ████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████ [201]

169.    ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████ [202] █████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ [203]

170.    ████████████████████████████████████████

███████████████████████████████████████████████

---

[198] BlockKelly0000002742.

[199] BlockKelly0000002319; BlockKelly0000000434.

[200] BlockKelly0000002319.

[201] BlockKelly00000002348.

[202] BlockKelly00000002814-2815.

[203] BlockKelly00000002825.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 [redacted] [204]

2 171. [redacted]

3 [redacted]

4 [redacted] [205]

5 [redacted]

6 [redacted] [206]

7 172. [redacted]

8 [redacted] [207]

9 [redacted]

10 [redacted] [208]

11 173. [redacted]

12 [redacted]

13 [redacted] [209]

14 174. [redacted]

15 [redacted]

16 [redacted]

17 [redacted]

18 [redacted]

19 [redacted]

20 [redacted]

21

22 _____

23 [204] BlockKelly00000002859; BlockKelly0000002388.

24 [205] BlockKelly0000002863.

25 [206] *Id.*

26 [207] BlockKelly0000002881.

27 [208] BlockKelly0000002953.

28 [209] BlockKelly0000002928.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**3.    The Board Failed to Oversee** ████████████████████

████████████████████████

175.    Despite the fundamental role that compliance plays in the financial services industry, ████████████████████

████████████████████████████████

████████████████████████████

176.    ████████████████████████

████████████████████████████████

████████████████████████████

177.    ████████████████████████

████████████████████████████████

███████████████████████[210]

178.    ████████████████████████

████████████████████████████[211]

████████████████████████████████

███████████████[212]

179.    ████████████████████████

████████████████████████████████

██████████████████████████[213]

180.    ████████████████████████

████████████████████████████████

████████████████████████████████



---

[210] BlockKelly0000002746.

[211] BlockKelly0000002765.

[212] BlockKelly0000002766.

[213] BlockKelly0000003321.



181.

182.

183.

184.

185.

186.

---

[214] BlockKelly0000002795.

[215] BlockKelly0000002841.

[216] BlockKelly0000002418.

1

2

3

4

5

6

**4.** ████████████████████████████

████████████

187.    Publicly available court filings show that the CFPB has been investigating Block since August 2020.[217] ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████[218]

188.    ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[217] *See Consumer Financial Protection Bureau v. Block, Inc.*, Case No. No. 22-mc-80214-SK (N.D.    Cal.)    at    ECF    No.    27,    *available    at* https://fingfx.thomsonreuters.com/gfx/legaldocs/zgpobmexbvd/BANKING%20FINTECH%20C FPB%20order.pdf.

[218]    BlockKelly0000003215,  3218. ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

189. The Board's abdication of its duty to monitor and oversee the Company's response to the CFPB investigation ultimately resulted in the CFPB, NYDFS, and other regulators instituting restitution, fines and penalties against the Company of up to $295 million.

**E. News Reports Reveal to Shareholders that Block's Assurances of a Comprehensive Compliance Program Were Not True.**

190. The Hindenburg Report, published on March 23, 2023, directly contradicts the Company's continued assurances of a comprehensive and robust compliance program. The Hindenburg Report found that Block's "magic" was not attributable to its innovation, but rather to its "willingness to facilitate fraud against consumers and the government, avoid regulation, dress up predatory loans and fess as revolutionary technology, and mislead investors with inflated metrics."[219]

191. The Hindenburg Report further revealed that Block has continually overstated the number of Cash App's users by focusing on misleading metrics, thereby artificially inflating estimated engagement with the platform as well as artificially depressing costs Block pays to acquire new users. Former Block employees were cited in the Hindenburg Report as stating that between 40% and 75% of all Cash App accounts were fake, involved in fraud, or known duplicative accounts tied to a single individual.

192. Block's "transacting active users" metric failed to account for multiple accounts associated with a single active user and inflated Cash App's active users to make it seem as if Cash App has greater engagement and activity than it does in reality. This method of measuring engagement also allow Block to falsely claim that its customer acquisition costs are lower than its competitors' costs.

193. Block regularly reported their financials to shareholders through their quarterly

---

[219] *See* Hindenburg Report.

Shareholder Letters signed by Defendant Dorsey. Numerous Shareholder Letters published during the Relevant period misled Block shareholders by reporting the Company's growth and user metrics results through the lens of transacting actives:

- On February 26, 2020, the FY19 Shareholder Letter stated that Cash App had approximately 24 million monthly active customers in December 2019, achieving 60% year-over-year growth.

- On May 6, 2020, the 1Q20 Shareholder Letter stated that, in April, "Cash App delivered strong revenue and gross profit growth year over year, and achieved its highest monthly totals for net-new transacting active customers, peer-to-peer volumes, Cash Card spend, Cash Card orders, direct deposit transacting active customers, bitcoin volumes, stock brokerage volumes, and stored funds."

- On August 4, 2020, the 2Q20 Shareholder Letter stated that, in June, "Cash App had more than 30 million monthly transacting active customers, with more than 7 million spending on Cash Card."

- On November 5, 2020, the 3Q20 Shareholder Letter stated that, in the third quarter of 2020, "the number of average daily transacting active Cash App customers nearly doubled from the same period last year."

- On February 23, 2021, the FY20 Shareholder Letter stated that "Cash App continued to drive strong acquisition of new customers and retain its existing base: In December, Cash App had more than 36 million monthly transacting active customers, up more than 50% year over year."

- On May 6, 2021, the 1Q21 Shareholder Letter stated: "We continued to drive acquisition of net-new transacting active Cash App customers as well as engagement with Cash Card, Boost, direct deposit, stock brokerage, bitcoin investing, and business accounts."

- On August 1, 2021, the 2Q21 Shareholder Letter stated that, in the second quarter, "volume sent through Cash App's network increased by nearly 4x compared to two years ago, driven by growth in existing customers and newer customers transacting more frequently."

- On November 4, 2021, the 3Q21 Shareholder Letter stated: "In October, we expect Cash App to deliver strong gross profit growth year over year and on a two-year CAGR basis driven by growth in monthly actives, engagement across our ecosystem, and inflows into Cash App."

- On February 24, 2022, the FY21 Shareholder Letter stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

- On May 5, 2022, the 1Q22 Shareholder Letter stated: "We are focused on expanding our customers' awareness and access to bitcoin, which has allowed us to drive meaningful adoption: As of the end of the first quarter, more than 10 million Cash App accounts have bought bitcoin since the product was introduced."

- On August 4, 2022, the 2Q22 Shareholder Letter stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem, such that overall inflows grew quarter over quarter and year over year."

- On November 3, 2022, the 3Q22 Shareholder Letter stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

- On February 23, 2023, the FY22 Shareholder Letter stated: "We ended the year with 51 million monthly transacting actives in December, with two out of three transacting each week on average."

- On May 4, 2023, the 1Q23 Shareholder Letter stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

- On August 3, 2023, the 2Q23 Shareholder Letter stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

- On November 2, 2023, the 3Q23 Shareholder Letter stated that, in September, "Cash App had 55 million monthly transacting actives, up 11% year over year."

194. Furthermore, Block's "frictionless" approach in attempting to keep acquisition costs low facilitated criminal conduct by allowing users to create a banking account with merely a phone number, or with merely an email and a zip code – thereby creating a system whereby a user could rejoin the Cash App platform multiple times, even if previously banned for fraud.

195. Former Block employees also revealed that Block would routinely blacklist an account flagged for fraud or other prohibited activity, without banning the user. Because blacklisted accounts were regularly associated with dozens or hundreds of other active accounts suspected of fraud, Block knowingly failed to stop fraudulent users from accessing its platform. Even for users who had given Block their full Social Security numbers, a former employee stated that Block would not ban the user based on the Social Security number, but instead would allow the user to start new accounts with an email address or phone number.

196. The foregoing statements by Block's former employees are confirmed by the books and records obtained by Plaintiff. As discussed *supra* IV.D, ████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

███████████████████████████████████████████

197.    Further, more than a dozen interviews conducted with former employees revealed that pressure from management resulted in a pattern of disregard for AML and KYC laws, resulting in the proliferation of multiple and fake accounts.  A former employee likened the Company's approach to Cash App's verification process as the "wild, wild West," stating that the Company did not really have any controls.[220]

198.    As revealed in the Hindenburg Report and as confirmed by the books and records obtained by Plaintiff, users are able to change their names and account photos easily, without Cash App making any changes to its internal data regarding the user's account.  As a result, Cash App has been observed as a tool for fraud, impersonation, sex trafficking, and other crimes by the Department of Justice ("DOJ") and other regulators.

199.    By way of example, Cash App apparently became the preferred tool for users to commit fraud with respect to COVID-19 relief funds. ███████████████████████ ██████████████████████████████████████████████ ████████████████████████████[221]  As set forth above, shortly after the CARES Act was signed into law, approximately 11 million people activated the direct deposit feature on their existing Cash App accounts, or set up new deposit-enabled accounts.  Within weeks, however, state governments across the United States were seeking to claw back fraudulent payments – and those fraudulent payments disproportionately were paid out by banks with whom Cash App partnered.

200.    Massachusetts, for example, sought to claw back 69,000 unemployment payments from Cash App accounts four months into the pandemic, with Cash App's partner bank having a disproportionate number of suspect transactions compared to major banks, despite the larger banks having four to five times as many total deposit accounts.

201.    In Ohio, Cash App's partner bank had eight times as many suspect pandemic-

---

[220] *See* Hindenburg Report.

[221] BlockKelly0000002333.

related unemployment payments compared to the largest unemployment claims processors, despite the fact that the other banks processed twice as many claims as Cash App's bank.

202. Block's compliance failures were at the root of the discrepancy: Block permitted single accounts to receive unemployment payments on behalf of multiple individuals, from different states, with ineffective address verification. This lack of compliance controls allowed users to impersonate others and commit COVID-19 pandemic relief fraud.

203. Cash App received concerns from its own employees, the Secret Service, the U.S. Department of Labor's Office of the Inspector General, FinCEN, and state regulators, who all flagged the issue of multiple COVID relief payments going to the same account as an obvious sign of fraud.

204. Block's mission of expanding financial access to the "unbanked" and "underbanked," combined with its "frictionless approach" to banking has not only enabled fraud, but has facilitated criminal activity. According to a leading non-profit organization, as cited in the Hindenburg Report, Cash App is "by far" the top app used in U.S sex trafficking. Former compliance employees confirmed that they repeatedly saw patterns indicating Cash App's use in sex trafficking, including late-night Uber rides, hotel purchases, and constant travel between states.

205. On March 30, 2023, the Company issued a response to some of the issues raised in the Hindenburg Report (the "Company's Response"), disclosing, *inter alia*, that of the more than 51 million monthly transacting actives reported for December 2022, only 44 million were connected to an identity verified through the Company's identify verification (IDV) program, and that of those 44 million verified accounts, only 39 million were attributable to a unique Social Security number.[222] The Company also disclosed that a Cash App user can send and receive up

---

[222] *See* Company Response, *available at* https://s29.q4cdn.com/628966176/files/doc_downloads/2023/03/Responses-to-Recent-Investor-Questions-March-30-2023.pdf.

to $1,000 within any 30 day period before going through any identity verification.[223]

206.    In response to being asked how much fraud and illicit activity is on the system, the Company reported that it was "challenging" to estimate, but that it measures the number of accounts that it "denylists," which it described as a control that prevents sending and receiving funds, using a Cash App Card, buying stocks or bitcoin, or taking a loan.[224] The Company reported that in 2022, approximately 2.4% of Cash App transacting active accounts were denylisted by its Compliance and Risk teams.[225]

207.    On March 31, 2023, Hindenburg Research remarked on the Company's Response in an article titled "Block's Response Confirmed Inflated User Counts While Ignoring Other Key Issues."  In the article, Hindenburg Research noted that the Company's Response disclosed for the first time that the Company has internal estimates of the number of users of Cash App that differ widely from the number of "transacting actives" disclosed to investors, and that although the Company reported that 2.4% of Cash App transacting active accounts were denylisted, the metric says "nothing about how many accounts *should* have been denylisted, metrics in previous years, or really much of anything."[226]

208.    Almost a year later, on February 16, 2024, *NBC News* published an article titled "Federal regulators are probing whether Cash App leaves door open to money launderers, terrorists" which revealed that, among other things, that Federal financial regulators were "exploring allegations by two whistleblowers that Cash App performed inadequate due diligence on customers, potentially opening the door to money laundering, terrorism financing and other

---

[223] *Id.*

[224] *Id.*

[225] *Id.*

[226] *Block's Response Confirmed Inflated User Counts While Ignoring Other Key Issues*, HINDENBURG RESEARCH (Mar. 31, 2023), https://hindenburgresearch.com/block-response/.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

illegal activities."[227]  The *NBC News* article explained that although banks are required to know the true identity of every customer, the whistleblowers revealed that the Cash App program "had no effective procedure to establish the identity of its customers."[228]

209.    According to the February 16, 2024 *NBC News* article, the two whistleblowers filed complaints with FinCEN and made submissions to the SEC and the Commodities Futures Trading Commission, and their allegations, which span from 2016 through 2022, detail "'a shadow financial system beyond the reach of regulators' where due diligence on Cash App's users was negligible and often did not adhere to sound banking practices and rules."[229]  The whistleblowers also stated that lax due diligence on Cash App customers posed risk for Block shareholders, who had not been advised of such risks.

210.    Subsequently, on May 1, 2024, *NBC News* published another article about the Company, which was titled "Federal prosecutors are examining financial transactions at Block, owner of Cash App and Square."[230]  The article revealed that a former employee was in discussions with federal prosecutors about widespread and yearslong compliance lapses at the Company's two main units – Square and Cash App.  The article further revealed that federal prosecutors were in discussions with a former employee who provided documents showing that "insufficient information is collected from Square and Cash App customers to assess their

---

[227] Gretchen Morgenson, *Federal regulators are probing whether Cash App leaves door open to money launderers, terrorist*, NBC NEWS (Feb. 16, 2024), https://www.nbcnews.com/business/personal-finance/whistleblowers-cash-app-leaves-door-open-money-laundering-terror-rcna138958.

[228] *Id.*

[229] *Id.*

[230] Gretchen Morgenson, *Federal prosecutors are examining financial transactions at Block, owner of Cash App and Square*, NBC NEWS (May 1, 2024), https://www.nbcnews.com/business/personal-finance/prosecutors-examining-transactions-block-owner-cash-app-square-rcna147181.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

risks."[231]  The former employee also told prosecutors that "[a]long with senior management, the Block board of directors was informed of extensive lapses at the company," commenting to *NBC News* that "[f]rom the ground up, everything in the compliance section [at Block] was flawed."[232]

### F.     The Director and Officer Defendants Are Obstinate After the Release of the Hindenburg Report.

211.    ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████[233]███████████████████████████████████████████

████████████████████████████████████████████[234]██████

████████████████████████████████████████████████████████████████

████████████████████[235]████████████████████████████

████████████████████    As described *supra* ¶ 205, the Company's response failed to address the substance of the Hindenburg Report.

212.    ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████[236]██████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



---

[231] *Id.*

[232] *Id.*

[233] BlockKelly0000003230.

[234] BlockKelly0000002323.

[235] *Id.*

[236] BlockKelly0000003291; BlockKelly0000003300.

1　████████████████████████████████████████

2　██████████████████████[237] Notably, the Company's Response was subsequently

3　deleted from the Company's website.

4　　　213.　████████████████████████████████

5　████████████████████████████████████████

6　████████████████████████████████████████

7　████████[238]

8　　　214.　████████████████████████████████

9　████████████████████████████████████████

10　████████████████████████████████████████

11　███████████████████████████████████[239] ███

12　████████████████████████████████████████

13　████████████████████████████████████████

14　████████████████████████████████

15　　　215.　████████████████████████████████

16　████████████████████████████████████████

17　██████████[240] ████████████████████████████

18　████████████████████████████████████████

19　██████████[241] ██████████████████████████

20　█████████████████[242]

21　　　216.　On May 4, 2023, Block held a conference call to discuss the Company's first fiscal

22　_____

23　[237] *Id.*

24　[238] BlockKelly0000003236.

25　[239] BlockKelly0000003277.

26　[240] BlockKelly0000003292.

27　[241] BlockKelly0000003246.

28　[242] BlockKelly0000003247.

quarter of 2023 hosted by defendants Dorsey and Ahuja. The first question by an analyst was about the Hindenburg Report. In response, Defendant Dorsey denied the allegations in the Hindenburg Report and stated: "I would say that we stand by our response to the shareholder report. . . . [Our] regulators trust us as well. So this is a significant focus for us and always has been." Defendant Ahuja provided additional detail, claiming that Block maintained a robust culture of compliance and stating in pertinent part as follows:

> Block operates a business that is highly regulated, and our goal is ultimately to expand access to the economy through intuitive financial products. In order to do that, we must maintain a culture of compliance and responsible risk management, including through investment in programs, processes, controls and teams with deep compliance expertise, prioritizing compliance ultimately helps us drive trust to their customers with regulators and external partners, and that enables us to then develop innovative products responsibly. We have significantly grown our investment in compliance over the last few years.

**G. The Individual Defendants' Failure to Ensure That the Company Implemented Adequate Compliance Measures and Managed Attendant Risks Subjects Block to Adverse Regulatory Actions and $295 Million in Penalties.**

217.    In August 2020, the CFPB first launched an investigation into Block's handling of fraud on its platform, seeking the production of information related to, among other things, Cash App's handling of customer complaints and disputes.  However, it was not until February 23, 2022, that the Company publicly disclosed the investigation in its annual report.

218.    Making matters worse, Block did not at first comply with the CFPB's investigation, as the CFPB was forced to file a petition to enforce its civil investigative demands ("CIDs") on the Company in August 2022.  The CFPB stated in connection with its petition that, over one year since its CIDs were served, Block was unable to provide a definitive date by which it expected to respond to certain CIDs, and that other CIDs still had deficient responses.  Block was ordered to comply with the CFPB's CIDs in November 2022, with fully responsive documents to be produced by January 5, 2023.

219.    In December 2023, the CFPB's Office of Enforcement informed the Company that it was considering recommending that the CFPB take legal action against the Company related to the topics addressed in its CIDs, and in July 2024, the CFPB's Enforcement Division advised the

Company that it had obtained authority to either settle this matter or pursue an enforcement action.

220. On January 16, 2025, the CFPB issued a consent order against Block (the "CFPB Consent Order"), finding that (i) for years after the inception of Cash App, Block failed to provide effective customer service for Cash App, including by failing to provide live telephone agents, which prevented consumers from being able to have their financial issues addressed in a proper and timely fashion and resulted in fake customer service lines through which consumers' information would be stolen, in a manner that was unfair in violation of the Consumer Financial Protection Act of 2010 (CFPA); (ii) **Block failed to take timely, appropriate, and effective measures to prevent, detect, limit, and address fraud on the Cash App platform** in a manner that was unfair in violation of the CFPA; (iii) Block used the card network chargeback process as a substitute for fulfilling its obligations under the Electronic Fund Transfer Act (EFTA) and Regulation E to investigate and resolve disputes about unauthorized transactions in a timely manner in violation of the CFPA's prohibition on unfair practices; (iv) Block engaged in deception by misrepresenting that it protected consumers from unauthorized transfers and had a telephone line to report such unauthorized transfers; and (v) Block failed to comply in multiple ways with the requirements of EFTA and Regulation E, including regarding error resolution.[243]

221. As part of the CFPB Consent Order, Block is required to (i) pay up to $120 million in refunds and other redress to consumers whose unauthorized transfers were not investigated, consumers who did not receive refunds they were entitled to, and consumers whose accounts were locked for an extended period of time or who were not provided provisional credits during a delayed investigation; (ii) set up 24-hour, live-person customer service and fully investigate unauthorized transactions and provide timely refunds, where appropriate; and (iii) pay a $55 million penalty to the CFPB's victim relief fund, totaling $175 million in restitution and fines.[244]

---

[243] *See* CFPB Consent Order (Jan. 16, 2025), https://files.consumerfinance.gov/f/documents/cfpb_block-inc-consent-order_2025-01.pdf.

[244] *Id.*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

222.    The CFBP stated that Block **"employed weak security protocols for Cash App and put its users at risk,"** and that although it was legally required to "investigate and solve disputes about unauthorized transactions, the company's investigations were woefully deficient."[245]

223.    CFPB Director Rohit Chopra commented that "**Cash App created the conditions for fraud to proliferate on its popular payment platform**," adding that "**[w]hen things went wrong, Cash App flouted its responsibilities** and even burdened local banks with problems that the company caused."[246]

224.    The CFBP's press release also details how Block deprived Cash App users of "meaningful and effective customer service and left the network vulnerable to criminals defrauding users."[247]

225.    Just one day prior to the CFPB's announcement, on January 15, 2025, the Conference of State Bank Supervisors ("CSBS") announced that Block had agreed to pay an additional $80 million fine in a settlement with 48 U.S. state financial regulators for "violations of the Bank Secrecy Act ("BSA") and anti-money laundering ("AML") laws that safeguard the financial system from illicit use."[248]

226.    According to the CSBS press release, "[u]nder BSA/AML rules, financial services firms are required to perform due diligence on customers, including verifying customer identities, reporting suspicious activity, and applying appropriate controls for high-risk accounts.  State regulators found Block was not in compliance with certain requirements, creating the potential

---

[245] Press Release, CFPB, CFPB Orders Operator of Cash App to Pay $175 Million and Fix Its Failures on Fraud (Jan. 16, 2025), https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-operator-of-cash-app-to-pay-175-million-and-fix-its-failures-on-fraud/.

[246] *Id.*

[247] *Id.*

[248] Press Release, CSBS, State Regulators Issue $80 Million Penalty to Block, Inc., Cash App for BSA/AML Violations (Jan. 15, 2025), https://www.csbs.org/newsroom/state-regulators-issue-80-million-penalty-block-inc-cash-app-bsaaml-violations.

that its services could be used to support money laundering, terrorism financing, or other illegal activities." [249]

227.     Pursuant to the Company's settlement agreement and consent order with the participating states, Block agreed to pay the assessed penalty to the state agencies, establish a compliance management committee, hire an independent consultant to review the comprehensiveness and effectiveness of its BSA/AML program, and submit a report to the states within nine months. [250]  Block then will have twelve months to correct any deficiencies found in the review after the report is filed. [251]

228.     On April 10, 2025, Block was also forced to settle with NYDFS for an additional $40 million for its inadequate BSA/AML program.  As NYDFS Superintendent Adrienne A. Harris stated in a press release from her office announcing the settlement, ***The rapid growth of Block's Cash App absent a robust compliance function created risk and vulnerabilities that violated the rules*** financial services companies operating in New York must adhere to." [252] NYDFS further contended that its investigation revealed "***critical gaps in Block's…BSA/AML program, including inadequate customer due diligence, failure to implement sufficient risk-based controls designed to prevent money laundering and illicit activity, and failure to effectively and timely monitor transactions***." [253]

---

[249] *Id.*

[250] *See* Settlement Agreement and Consent Order Block, Inc., Jan. 15, 2025, *available at* https://www.csbs.org/sites/default/files/other-files/Block_Settlement_and_Consent_OrderFinal_1.13.2025-order%20only.pdf.

[251] *Id.*

[252] NYDFS, *Superintendent Adrienne A. Harris Secures $40 Million Settlement with Block, Inc. for Inadequate Anti-Money Laundering Program and Virtual Currency Compliance Failures on Cash App Platform*, Apr. 10, 2025, *available at* https://www.dfs.ny.gov/reports_and_publications/press_releases/pr202504101.

[253] *Id.*

229.    NYDFS also released the terms of the NYDFS Consent Order with Block on April 10, 2025. The NYDFS Consent Order detailed "two full-scope examinations" NYDFS conducted of Block which ended in September 2022, and which identified significant deficiencies including with respect to Block's KYC practices, transaction monitoring practices, and SARs during 2018-2021.[254] The NYDFS Consent Order further detailed the deficiencies in Block's BSA/AML program, backlogs in its SAR filings and transaction monitoring alerts, other transaction monitoring failures, KYC deficiencies, cybersecurity deficiencies, and consumer protection deficiencies, all of which it contended amounted to a failure to maintain an effective and compliant anti-money laundering program in violation of New York state law.[255] As a result, NYDFS imposed $40 million in fines and required the Company to engage the services of an independent monitor selected by NYDFS for a twelve-month period following execution of the Consent Order to enhance the Company's compliance programs.[256]

230.    Furthermore, shortly after the publication of the Hindenburg Report in March 2023, the Company received inquiries from the SEC and DOJ. The SEC sent a follow-on inquiry in July 2024, which is believed to be primarily related to the allegations raised in the Hindenburg Report, as well as the Company's compliance and risk practices, and related disclosures. According to Block's Annual Report on Form 10-K for the fiscal year ended December 31, 2024, filed with the SEC on February 24, 2025, ("2024 10-K"), the SEC and DOJ investigations are still ongoing, and the Company is unable to predict the outcome of these investigations or provide any assurances that the SEC and/or DOJ will not take legal action against the Company.

231.    The 2024 10-K also disclosed for the first time that the Company received subpoenas from Attorneys General from multiple states, seeking the production of information

---

[254] NYDFS Consent Order at 2, *In the Matter of Block, Inc.*, *available at* https://www.dfs.ny.gov/system/files/documents/2025/04/ea20250410-block.pdf.

[255] *Id*. at 5-13.

[256] *Id*. at 13-15.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

related to, among other things, Cash App's handling of customer complaints and disputes. The Company reported that it was presented with the results of an investigation conducted by the state Attorneys General in June 2024, and that in December 2024, the state Attorneys General presented the Company with potential terms for resolving the matter. The Company also disclosed that although it is in discussions with the state Attorneys General, it is unable to predict the outcome and cannot provide any assurances that the state Attorneys General will not take legal action against the Company.

232.    The 2024 10-K further disclosed that the Company was in negotiations with the New York State Department of Financial Services regarding aspects of its Bank Secrecy Act/anti-money laundering and bitcoin program, and that in January 2025, NYDFS presented the Company with potential terms to resolve the matter.

**H.    A Securities Class Action Lawsuit Is Filed against the Company for Issuing Materially Misleading Statements Concerning the Wrongdoing Alleged Herein.**

233.    In addition to the foregoing investigations, and the resulting fines and penalties, the Company is also the subject of a costly securities fraud litigation stemming from materially false and misleading statements made in connection with the wrongdoing alleged herein.

234.    On January 17, 2025, a securities class action lawsuit was filed against Block in the U.S. District Court for the Northern District of California (the "Securities Class Action"). The Securities Class Action alleges that from February 26, 2020 through and inclusive of April 30, 2024, the Company made false and/or misleading statements and/or failed to disclose that: (i) Block had engaged in widespread and years-long compliance lapses at Square and Cash App, including by failing to conduct basic due diligence regarding its customers' identities or the nature of customer transactions so as to prevent the platforms from being used for illegal or illicit activities; (ii) Block had effectively created a haven for widespread illegal and illicit activities on its Square and Cash App platforms by imposing minimal obligations on customers seeking to open accounts, transact, and deposit or withdraw funds; encouraging the use of bitcoin; and pressuring Block's banking partners to forgo ordinary know your customer due diligence

activities; (iii) thousands of transactions on Square and Cash App were made in connection with a wide variety of illegal and illicit activities, including, among other things, money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and illicit payments to entities and persons subject to economic sanctions; (iv) Block allowed its customers to withdraw funds even after the accounts had been flagged for potentially illegal or illicit activities; (v) Block customers could open up multiple accounts using fake identities in order to engage in illegal or illicit activities; (vi) Block's senior leadership and the Board of Directors had failed to correct identified compliance deficiencies despite numerous red flags, internal employee reports of deficiencies, and customer complaints; (vii) Block's Cash App user metrics had been artificially inflated through the use of fake accounts and the ability of criminals and other bad actors to open multiple accounts; and (viii) as a result of the above, Block was subject to a material, undisclosed risk of its conduct being exposed, thereby exposing Block to reputational harm, adverse regulatory actions, the loss of business activity, and adverse impacts to Block's operations and financial results.

## V.     BLOCK IS A CONTROLLED COMPANY

235.    From 2017 to the present, co-founders Dorsey and McKelvey have had the majority voting control of the Company despite holding a minority economic interest. Dorsey and McKelvey have been able to maintain control of the Company by means of the Block's dual-class stock structure, which entitles Block's Class A common stock ("Class A") to one vote per share and Block's Class B common stock ("Class B") to ten votes per share.  Class B's ten-to-one voting rights means that holders of Block Class B common stock are able to exert outsized influence when both classes of stock vote together as they are generally required.

236.    The below chart illustrates Dorsey and McKelvey's outsized control of the Company due to their ownership in the Company's Class B common stock:

| Date (as of) | Dorsey (# of shares) | Dorsey % of Total Voting Power | McKelvey (# of shares) | McKelvey % of Total Voting Power | Combined % Total Voting Power |
|---|---|---|---|---|---|
| | | | | | |

| 3/31/2016 | Class A: N/A<br>Class B: 69,504,082 | 22.7% | Class A: N/A<br>Class B: 27,345,120 | 8.9% | 31.6% |
|---|---|---|---|---|---|
| 3/31/2017 | Class A: N/A<br>Class B: 65,513,132 | 38.98% | Class A: 68,926<br>Class B: 23,717,347 | 14.12% | 53.1%[257] |
| 3/31/2018 | Class A: N/A<br>Class B: 63,189,272 | 44.73% | Class A: 57,572<br>Class B: 20,247,347 | 14.34% | 59.07% |
| 3/31/2019 | Class A: N/A<br>Class B: 59,469,117 | 49.38% | Class A: 68,796<br>Class B: 15,629,347 | 12.98% | 62.36% |
| 3/31/2020 | Class A: N/A<br>Class B: 59,297,392 | 51.32% | Class A: 248,233<br>Class B: 15,454,347 | 13.4% | 64.72% |
| 3/31/2021 | Class A: N/A<br>Class B: 49,544,566 | 48.08% | Class A: 175,045<br>Class B: 13,631,216 | 13.24% | 61.32% |
| 3/31/2022 | Class A: N/A<br>Class B: 48,844,566 | 43.04% | Class A: 125,061<br>Class B: 12,259,025 | 10.81% | 53.85% |
| 3/31/2023 | Class A: 1,000,000<br>Class B: 47,844,566 | 41.7% | Class A: 126,733<br>Class B: 12,259,025 | 10.7% | 52.4% |
| 3/31/2024 | Class A: 1,000,000<br>Class B: 47,844,566 | 41.3% | Class A: 131,527<br>Class B: 12,259,025 | 10.5% | 51.8% |

237.    Dorsey and McKelvey's outsized control of the Company has allowed them to influence decisions requiring shareholder votes.

238.    For example, at the Company's annual stockholder meeting held on June 14, 2022 (the "Annual Meeting"), the shareholders were asked to vote upon a proposal submitted by one of the Company's shareholders regarding changing the shareholder voting rights such that Class A and Class B common stock would get an equal number of votes. In support of the proposal, the shareholder noted that the co-founders outsized voting power "raise[s] concerns that the

---

[257] Block's Class B common stock is convertible at any time by the holder into shares of Class A common stock on a share-for-share basis, such that each holder of Class B common stock beneficially owns an equivalent number of Class A common stock. The massive conversion of Class B common stock to Class A common stock between 2016 and 2017 meant a greater percentage of total voting power for those still holding Class B shares – particularly Dorsey and McKelvey.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  interests of public stockholders may be subordinate to those of the co-founders."[258]

2    239. The shareholder proposal required the affirmative vote of a majority of the voting

3  power of the shares of common stock present virtually or by proxy at the Annual Meeting and

4  entitled to vote thereon.  The Company disclosed that abstentions will have the effect of a vote

5  against this proposal and broker non-votes will have no effect.  But the shareholder vote on the

6  proposal was *fait accompli*, as Dorsey and McKelvey already possessed enough voting power to

7  shoot down the proposal from the gate.  As expected, the proposal was rejected.

8  ## VI. INSIDER TRADING CLAIMS

9    **A. Block's Insider Trading Policy Proscribes Insider Trading.**

10    240.



19    241.

20  [261]

21    242.

---

258 Block Proxy Statement, filed with the SEC on Form 14A on June 14, 2022 at 10.

259 BlockKelly0000000133-0155.

260 BlockKelly0000000151.

261 BlockKelly0000001910-1932; BlockKelly0000000504-0526; BlockKelly0000002054-2076;
BlockKelly0000000693-0715.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████ make it abundantly clear that the Company's directors and officers, particularly Dorsey and McKelvey, were acutely aware that it was a violation of federal securities laws to misuse material nonpublic information in securities trading.

**B.      The Company's Two Co-Founding Directors, Dorsey and McKelvey, Collectively Sold Over $1 Billion of Block Stock at Artificially Inflated Prices While in Possession of Material Non-Public Information.**

243.    As described herein, Block had a 639% stock increase in the 18 months following the initial COVID-19 shutdown and subsequent pandemic.  As also described herein, this growth was fueled by a lessening of risk controls and compliance measures.

244.    As directors of Block, Defendants Dorsey and McKelvey (the "Insider Trading Defendants") were privy to material, non-public information about the true state of Block's business and operations.

245.    The Insider Trading Defendants used their knowledge of Block's material, non-public information to sell their personal holdings while they knew the Company's stock was artificially inflated during the Relevant Period.  Together, the Insider Trading Defendants collectively sold over $1 billion of stock when the Company's stock was artificially inflated as a result of the Company's deficient compliance measures.

246.    Specifically, from November 16, 2020, through and inclusive of May 17, 2021, Defendant Dorsey sold 2,712,148 shares of Block Class A Common stock for a total profit of $621,065,064, as illustrated in the below chart:

| Date | # of Class A Shares Sold | Avg. Trading Price | Total Amount |
|------|--------------------------|--------------------|--------------|
| November 16, 2020 | 100,000 shares | $175.95 | $17,595,375 |
| November 23, 2020 | 100,000 shares | $202.74 | $20,273,924 |
| November 30, 2020 | 100,000 shares | $209.14 | $20,914,482 |
| December 7, 2020 | 100,000 shares | $206.69 | $20,969,001 |
| December 14, 2020 | 100,000 shares | $216.87 | $21,687,104 |
| December 21, 2020 | 100,000 shares | $238.86 | $23,885,834 |

| December 28, 2020 | 100,000 shares | $227.43 | $22,742,962 |
| January 4, 2021 | 100,000 shares | $219.53 | $21,952,825 |
| January 11, 2021 | 100,000 shares | $229.87 | $22,987,316 |
| January 19, 2021 | 100,000 shares | $227.88 | $22,787,786 |
| January 25 2021 | 100,000 shares | $222.81 | $22,281,355 |
| January 25, 2021 | 100,000 shares | $215.97 | $21,596,701 |
| February 1, 2021 | 12,148 shares | $217.91 | $2,647,171 |
| February 8, 2021 | 100,000 shares | $249.61 | $24,960,566 |
| February 16, 2021 | 100,000 shares | $277.59 | $27,759,279 |
| February 22, 2021 | 100,000 shares | $271.30 | $27,130,427 |
| March 1, 2021 | 100,000 shares | $235.27 | $23,526,964 |
| March 8, 2021 | 100,000 shares | $215.22 | $21,522,386 |
| March 15, 2021 | 100,000 shares | $242.07 | $24,207,166 |
| March 22, 2021 | 100,000 shares | $224.29 | $22,428,655 |
| March 29, 2021 | 100,000 shares | $210.26 | $21,025,910 |
| April 5, 2021 | 100,000 shares | $230.13 | $23,012,880 |
| April 12, 2021 | 100,000 shares | $259.25 | $25,924,783 |
| April 19, 2021 | 100,000 shares | $250.07 | $25,006,842 |
| April 26, 2021 | 100,000 shares | $249.33 | $24,932,781 |
| May 3, 2021 | 100,000 shares | $245.60 | $24,559,654 |
| May 10, 2021 | 100,000 shares | $225.47 | $22,546,921 |
| May 17, 2021 | 100,000 shares | $201.98 | $20,198,014 |
| **TOTAL** | **2,712,148 shares** | **$228.54** | **$621,065,064** |

247.     Defendant McKelvey likewise materially benefited by selling his personal holdings with knowledge that the Company's stock was artificially inflated. Specifically, from August 18, 2020, through and inclusive of August 17, 2021, McKelvey sold 2,600,000 shares of Block Class A Common stock for a total profit of $564,330,020, as illustrated in the below chart:

| Date | # of Class A Shares Sold | Avg. Trading Price | Total Amount |
| --- | --- | --- | --- |
| August 18, 2020 | 200,000 | $149.79 | $29,957,007 |
| September 15, 2020 | 200,000 | $153.93 | $30,786,196 |
| October 13, 2020 | 200,000 | $189.80 | $37,959,868 |
| November 16, 2020 | 200,000 | $177.03 | $35,405,324 |
| December 14, 2020 | 200,000 | $217.36 | $43,472,216 |
| January 19, 2021 | 200,000 | $225.72 | $45,144,255 |
| February 16, 2021 | 200,000 | $277.45 | $55,489,771 |
| March 16, 2021 | 200,000 | $247.70 | $49,539,664 |
| April 19, 2021 | 200,000 | $246.17 | $49,233,305 |
| May 18, 2021 | 200,000 | $205.56 | $41,111,883 |
| June 15, 2021 | 200,000 | $227.98 | $45,595,709 |
| July 12, 2021 | 200,000 | $242.98 | $48,595,130 |
| August 17, 2021 | 200,000 | $260.20 | $52,039,692 |

| TOTAL | 2,600,000 | $217.05 | $564,330,020 |

## VII. DEFENDANTS SOLICITED SHAREHOLDER APPROVAL FOR ELECTIONS AND COMPENSATION THROUGH MATERIALLY MISLEADING PROXY STATEMENTS.

248.    The Individual Defendants caused Block to file annual proxy statements with the SEC on Form DEF 14A on or about April 28, 2022 (the "2022 Proxy Statement"), April 28, 2023 (the "2023 Proxy Statement"), and April 26, 2024 (the "2024 Proxy Statement," and collectively, the "Proxy Statements").  The Proxy Statements were issued "[b]y order of the Board of Directors" and signed by Dorsey.  At the time that Dorsey signed the Proxy Statements, each of the Current Director Defendants served on the Board.

249.    Each of the Proxy Statements was intended to, and did, procure Block's shareholders' votes with respect to matters materially affecting the Company that legally required shareholder approval.  All three Proxy Statements sought and obtained election of the Current Director Defendants by shareholder vote, in each case upon the Board's explicit recommendation as to which directors should be elected.

250.    Each of the Proxy Statements was materially false in that it failed to disclose that the Company for a period of years failed to correct identified compliance deficiencies, including the failure to maintain an effective compliance and risk management system to adhere to governing laws and regulations.  Each of the Proxy Statements was materially false in that it failed to disclose that the Company continuously loosened its risk tolerances in order to accelerate Cash App growth, including the onboarding of Cash App users without requisite identity verification, and further including the proliferation of fraud and other criminal activity facilitated by the Cash App platform, including insurance fraud, scams and account takeovers, money laundering, gambling, drug dealing, sex trafficking, and organized crime.

251.    The foregoing facts were known to the Director Defendants and only discovered by Plaintiff through the exercise of his inspection rights to obtain internal Company books and records.  The foregoing facts rendered the following statements made regarding the Company's risk management in each of the Proxy Statements materially false:

**Risk Management**

Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk-aware and accountable organization. The oversight responsibility of our board of directors and its committees is supported by management reporting processes that are designed to provide visibility to our board of directors regarding the identification, assessment and management of risks and management's strategic approach to risk mitigation. Our Lead Independent Director and Chair of our audit and risk committee meet with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures, and escalate potential issues to our audit and risk committee or board of directors, as appropriate.

As part of our overall risk management process, we conduct an annual Enterprise Risk Assessment ("ERA"), which is shared and discussed with our board of directors. Oversight of the ERA is supported and enabled by our audit and risk committee. ***Our board of directors' oversight of the ERA framework includes a routine evaluation, with discussions with key management and outside advisors, as appropriate, of the processes used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's implementation and measurement of risk tolerances, limits and mitigation. Our board of directors, management and functional leaders of our ERA define our primary risk focus area for review. These areas include strategic, operational, people, financial and compliance. We address risks such as cybersecurity, financial reporting and competition within each of these areas***.

While our board of directors maintains ultimate responsibility for the oversight of risk, ***it has implemented a multi-layered approach that delegates certain responsibilities to the appropriate board committees to ensure that these primary areas of focus are discussed in detail and that a full understanding of the applicable risk is obtained. Our board of directors and its committees oversee risks associated with their respective areas of responsibility, as summarized below***. Each board committee meets in executive session with key management personnel and representatives of outside advisors as required or requested. Our board of directors may delegate additional risk areas to its committees in the future.

252.    These statements were materially false and misleading in that they failed to disclose that: (i) the Board's oversight of enterprise risk assessment, including its implementation of risk tolerances, limits, and mitigation, allowed an illegal business plan premised on falsely inflated Block user metrics; (ii) the Board's oversight of enterprise risk assessment, including its implementation of risk tolerances, limits, and mitigation, allowed for the proliferation of fraud and other criminal activity to be facilitated by the Cash App platform; and (iii) the Board either did not obtain the "full understanding of the applicable risk[s]," under their responsibility, or turned a blind eye and failed to correct identified compliance deficiencies.

253.    The Proxy Statements then went on to describe the primary areas of risk oversight

for each of the Board and its subcommittees as follows:

| Board of Directors / Committee | Primary Area of Risk Oversight |
| --- | --- |
| Full Board of Directors | Strategic, financial and execution risks and exposures associated with our business strategy, policy matters, succession planning, data privacy, data security, and cybersecurity, significant litigation and regulatory exposures and other current matters that may present material risk to our financial performance, operations, infrastructure, plans, prospects or reputation, acquisitions and divestitures and our operational infrastructure. |
| Audit and Risk Committee | Risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, our programs and policies relating to legal and regulatory compliance, data privacy, data security, cybersecurity and operational security and reliability, as well as matters of risk related to Square Financial Services.[262] |
| Nominating and Corporate Governance Committee | Risks and exposures associated with director and executive succession planning; director and corporate officer conflicts of interest, other than transactions with related persons reviewed by our audit and risk committee; environmental, social, corporate governance, inclusion and diversity, and corporate responsibility matters; and overall board and |

---

[262] The 2024 Proxy Statement revised the Audit Committee's primary area of risk oversight to include: "Risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, our programs and policies relating to legal and regulatory compliance, and operational security and reliability. In addition, our audit and risk committee assists our board of directors with oversight of certain matters related to privacy, data security and cybersecurity." The primary purpose of this changes appears to have been related to shifting responsibility for risk related to Square Financial Services.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | committee effectiveness and composition.[263] |
|---|---|
| Compensation Committee | Risks and exposures associated with leadership assessment, retention and succession, executive compensation programs and arrangements and our compensation philosophy and practices. |

254. The materially false Proxy Statements caused direct harm to the Company in that, among other things, Defendants' omissions perpetuated systemic legal violations within the Company, bringing severe fines, penalties, and other harm to which the Company was ultimately subjected, as well as through the creation of compensation obligations by the Company that would not have existed but for the materially false and incomplete Proxy Statements.

255. As a result of the false and misleading 2022 Proxy Statement and the Director Defendants' reelection to the Board in 2022, the Director Defendants entered into compensation contracts with the Company and afforded themselves a generous compensation program via a shareholder vote on the false and misleading 2022 Proxy Statement. Such compensation included, inter alia, $250,000.00 in restricted stock units for each non-employee director, an additional $70,000.00 in restricted stock units for Botha as Lead Independent Director, an additional $40,000.00 as an annual cash retainer, and the additional following cash fees for service on each of the committees of the Board of Directors:

| Board Committee | Chair Fee | Member Fee |
|---|---|---|
| Audit and Risk Committee | $20,000 | $10,000 |

---

[263] The 2023 Proxy Statement revised the Nominating and Corporate Governance Committee's primary area of risk oversight to include: "Risks and exposures associated with director and executive succession planning; conflicts of interest; environmental, social, corporate governance, inclusion and diversity, and corporate responsibility matters; and overall board and committee effectiveness and composition, as well as governance related matters related to Square Financial Services." The primary purpose of this changes appears to have been related to shifting responsibility for risk related to Square Financial Services.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | |
|---|---|---|
| Compensation Committee | $15,000 | $5,000 |
| Nominating and Corporate Governance Committee | $10,000 | $2,500 |
| Capital Compliance and Governance Committee | $15,000 | $5,000 |

256.    In total, the Company actually awarded 2022 compensation for each of the Director Defendants in the following amounts:

| Director | Fees Earned or Paid in Cash ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Roelof Botha | — | 375,524 | — | 375,524 |
| Amy Brooks | — | 292,784 | — | 292,784 |
| Shawn Carter | — | 290,152 | — | 290,152 |
| Paul Deighton | 50,934 | 249,944 | — | 300,878 |
| Randy Garutti | 50,000 | 249,944 | — | 299,944 |
| James McKelvey | — | 290,152 | — | 290,152 |
| Mary Meeker | — | 305,576 | — | 305,576 |
| Anna Patterson | — | 35,595 | — | 35,595 |
| Sharon Rothstein | 28,906 | 333,223 | — | 362,129 |
| Lawrence Summers | 50,000 | 249,944 | — | 299,944 |
| David Viniar | — | 44,468 | — | 44,468 |
| Darren Walker | — | 292,784 | — | 292,784 |

257.    As a result of the false and misleading 2023 Proxy Statement and the Director Defendants' reelection to the Board in 2023, the Director Defendants entered into compensation contracts with the Company and afforded themselves a generous compensation program via a shareholder vote on the false and misleading 2023 Proxy Statement.  Such compensation included, inter alia, $250,000.00 in restricted stock units for each non-employee director, an additional $70,000.00 in restricted stock units for Botha as Lead Independent Director, an additional $40,000.00 as an annual cash retainer, and the additional following cash fees for service on each of the committees of the Board of Directors:

| Board Committee | Chair Fee | Member Fee |
|---|---|---|
| Audit and Risk Committee | $20,000 | $10,000 |
| Compensation Committee | $15,000 | $5,000 |
| Nominating and Corporate Governance Committee | $10,000 | $2,500 |

258.    In total, the Company actually awarded 2023 compensation for each of the Director Defendants in the following amounts:

| Director | Fees Earned or Paid in Cash ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Roelof Botha | — | 374,618 | — | 374,618 |
| Amy Brooks | — | 292,220 | — | 292,220 |
| Shawn Carter | — | 289,720 | — | 289,720 |
| Paul Deighton | 65,000 | 249,959 | — | 314,959 |
| Randall Garutti | 50,000 | 249,959 | — | 299,959 |
| James McKelvey | — | 289,720 | — | 289,720 |
| Mary Meeker | — | 304,642 | — | 304,642 |
| Neha Narula | — | 236,125 | — | 236,125 |
| Sharon Rothstein | 45,000 | 249,959 | — | 294,959 |
| Lawrence Summers | 50,000 | 249,959 | — | 299,959 |
| Darren Walker | — | 290,243 | — | 290,243 |

259.    As a result of the false and misleading 2024 Proxy Statement and the Director Defendants' reelection to the Board in 2024, the Director Defendants entered into compensation contracts with the Company and afforded themselves a generous compensation program via a shareholder vote on the false and misleading 2024 Proxy Statement.   Such compensation included, inter alia, $250,000.00 in restricted stock units for each non-employee director, an additional $70,000.00 in restricted stock units for Botha as Lead Independent Director, an additional $40,000.00 as an annual cash retainer, and the additional following cash fees for service on each of the committees of the Board of Directors:

| Board Committee | Chair Fee ($) | Member Fee ($) |
|---|---|---|
| Audit and Risk Committee | 20,000 | 10,000 |
| Compensation Committee | 15,000 | 5,000 |
| Nominating and Corporate Governance Committee | 10,000 | 2,500 |

260.    The Company has not yet disclosed actual compensation awarded to each of the Director Defendants in 2024.

261.    Each of the Director Defendants was duty bound, pursuant to his or her general fiduciary duties under Delaware law and by the provisions of the federal securities laws, to fully

disclose all information material to the shareholders' decision concerning how to cast their votes in connection with the election of Board members in 2022, 2023, and 2024.

262.    Despite the Director Defendants' fiduciary duties and violations of state and federal law, the Board caused Block to file and disseminate the materially false Proxy Statements. Specifically, in the Proxy Statements, Defendants provided materially misleading information concerning the Company, the responsibilities of the Board and its subcommittees, the status of their oversight and enterprise risk management activities, and the basis upon which the members of the Board were seeking election to their terms of office.   In the Proxy Statements, the Defendants uniformly failed to disclose material information to shareholders concerning critical aspects of the Board's responsibilities and activities, including their obligation to ensure compliance with applicable banking and consumer protection laws.  The Proxy Statements also failed to disclose that the Company's financial and operating metrics were materially false due to the Company's failure to prevent widespread criminal misconduct within Block occurring through the creation of multiple accounts by the same user on the Cash App in order to perpetrate fraud and other criminal conduct on the Company's banking platform, which illegal conduct the Board was duty bound to prevent.

263.    The Proxy Statements were materially inaccurate and incomplete because, among other things, Defendants failed to disclose:

(a)    the extent to which the Company's financial performance depended upon the Company's artificially inflated guidance which failed to take into account that the Company allowed its customers, including those who had been supposedly blacklisted from the Company's systems, to continue to open multiple accounts on Cash App;

(b)    the extent to which the Director Defendants failed in their duties to oversee and ensure that the Company had functioning internal controls, enterprise risk management, and legal and regulatory compliance, including the Company's ongoing failure to detect and prevent fraud and other crimes from occurring on the platform, the Company's constantly bourgeoning compliance backlogs, and the failure to provide adequate levels of customer service;

(c)    the nature of the Director Defendants' performance of their duties under

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the charters of the Board's subcommittees, including the reason for the Director Defendants' decision to allow the Company to repeatedly relax its onboarding requirements in allowing customers to make multiple Square App accounts in order to favor growth through the illicit procurement of false customer accounts; and

(d)   the numerous instances in which the Board was informed that Cash App was used to facilitate unlawful conduct, including insurance fraud, fraudulent account takeovers, and other fraud; money laundering; gambling; drug dealing; sex trafficking; organized crime; and other illicit conduct.

264.   In light of the Defendants' highly material omissions from the Proxy Statements, the votes and the consequent elections of directors to the Board were obtained on the basis of false disclosures.   Had shareholders been provided with complete and accurate information concerning the Board's performance of its duties – including with respect to presiding over the Company's extensive facilitation of criminal activity – the members of the Board would not have been elected.

265.   The election of the Director Defendants inflicted significant harm on the Company.   The reliance on the Board's assumption of duty caused direct detriment to the Company which, in the absence of the Board's fulfillment of its obligations, was left helpless to prevent the misconduct occurring in its name.   The consequent penalties levied upon the Company, as well as the numerous other liabilities to the Company's customers and other third parties, were a direct result of the Board's perpetuation of the Company's misconduct, which was only made possible by the materially false and incomplete statements that caused the Director Defendants' election to the Board.   But for the Board's refusal to carry out its duties, the harm that befell the Company would not have occurred.

266.   Accordingly, Block has been damaged by the materially false and misleading statements and omissions in the Proxy Statements that procured the election of the Direct Defendants to the Board, thus perpetuating their misconduct, as well as shareholders' approval of compensation for directors who had been involved in wide-ranging criminal misconduct – a proposal that would have been rejected had the true facts been disclosed to shareholders.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VIII.  DEMAND FUTILITY AND INDEPENDENCE ALLEGATIONS

267.    At the time of the filing of this action, Block's Board consists of the following ten members, eight of which are defendants in this action: Dorsey, McKelvey, Botha, Brooks, Carter, Deighton, Eisen, Garutti, Meeker and Narula (the "Demand Board").

268.    Plaintiff has not made a demand on the Demand Board to assert the claims set forth herein because, for the reasons detailed above and as further set forth below, any such demand would be futile because a majority of the Board cannot properly exercise its independent and disinterested business judgment in responding to a demand.

269.    More specifically, demand is excused because a majority of the Demand Board faces a substantial likelihood of liability for the acts and omissions alleged herein and/or is controlled by and/or beholden to the two co-founder Defendants, Dorsey and McKelvey, who both materially benefited from the acts and omissions alleged herein and who both face substantial liability as a result.

### A.    Demand Is Excused Because a Majority of the Demand Board Faces a Substantial Likelihood of Liability for the Misconduct Alleged Herein.

#### 1.    The Current Director Defendants Face a Substantial Likelihood of Liability for Breaching their Fiduciary Duties.

270.    As current Board members and members of the Board during the Relevant Period, the Current Director Defendants (Dorsey, McKelvey, Botha, Brooks, Carter, Deighton, Garutti and Meeker) owed and continue to owe the Company an undivided duty of loyalty.  At all relevant times, the Current Director Defendants also "maintain[ed] ultimate responsibility for the [Company's] oversight of risk."[264]

271.    As outlined in Section IV.D. supra, the Board was presented with a plethora of red flags indicating the Company's failure to maintain effective compliance measures during the Relevant Period, which allowed fraud and other criminal activity to proliferate on the Cash App platform.  Among other things, ███████████████████████████████

---

[264] 2024 Proxy at 10.

1

2

3

4

5

6

7

8

9

272.    As a result of the foregoing, reasonable doubt exists as to whether the Current

Director Defendants acted in bad faith by abdicating their duty of oversight.    Accordingly,

demand upon the Current Director Defendants is futile, and thus excused.

        **2.**      **Botha and Deighton Face a Substantial Likelihood of Liability for Breaching their Fiduciary Duties as Members of the ARC.**

273.    In addition to their duties as Board members, both Botha and Deighton, as

members of the ARC, were also charged with fulfilling the duties set forth in the Audit and Risk

Committee Charter, including assisting the Board in overseeing the Company's risk assessment

and risk management and compliance with applicable laws and regulatory requirements.

274.    As members of the ARC, Defendants Both and Deighton were obligated, but

failed, to supervise the Company's risk management and regulatory compliance.

275.    As outlined *supra* §IV.D,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ As a result of the foregoing, reasonable doubt exists as to whether the Botha and Deighton acted in bad faith by abdicating their duties of oversight. Accordingly, demand upon Botha and Deighton is futile, and thus excused.

**3.    Dorsey Faces a Substantial Likelihood of Liability for Breaching His Fiduciary Duties as an Officer of the Company.**

276.    As the principal executive officer of the Company, Dorsey was responsible for the Company's decision to loosen compliance efforts in order to accelerate growth, as demonstrated by his continuous praise of Cash App's "frictionless" approach to expanding financial access to the "unbanked" and the "underbanked" populations.  As a result of the foregoing, reasonable doubt exists as to whether Dorsey abdicated his duties of good faith, fair dealing, loyalty and due care.  Accordingly, demand upon Dorsey is futile, and thus excused.

**4.    Dorsey and McKelvey Face a Substantial Likelihood of Liability for Engaging in Insider Selling During the Relevant Period.**

277.    As directors of the Company at the time they sold shares of Block stock, Dorsey and McKelvey (the Insider Trading Defendants) owed Block and its shareholders a fiduciary duty of loyalty and good faith.

278.    As alleged herein, Dorsey and McKelvey collectively sold over $1 billion of stock when the Company's stock was artificially inflated as a result of the Company's deficient compliance measures.

279.    At the time of their stock sales, Dorsey and McKelvey were in possession of material, adverse, non-public information as to the Company's deficient compliance measures and sold Company stock on the basis of such information.

280.    As a result of the foregoing, reasonable doubt exists as to whether the Dorsey and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

McKelvey acted in bad faith by engaging in insider selling during the Relevant Period. Accordingly, demand upon Dorsey and McKelvey is futile, and thus excused.

**B.**    **Demand Is Further Excused Because a Majority of the Demand Board Lacks Independence from Dorsey and/or McKelvey.**

281.    From 2017 to the present, Dorsey and McKelvey have jointly possessed over 50% of the Company's total voting power.  Notwithstanding, during this same time period, Dorsey alone possessed enough voting power to be regarded as a controlling shareholder.  In fact, as of March 31, 2020, Dorsey controlled over 50% of the vote.

282.    Consequently, each of the Company's current directors (i.e., Botha, Brooks, Carter, Deighton, Eisen, Garutti, Meeker, Narula) lacks independence from Dorsey and/or McKelvey because of their coercive influence as the Company's joint controllers whose voting power allows them to dictate, among other things, the composition of the Company's Board of Directors.

**1.**    **Defendant Forsey Further Lacks Independence.**

283.    Dorsey, who the Company concedes is not independent within the meaning of the listing standards of the NYSE, could not independently and disinterestedly consider a demand because he lacks independence from McKelvey, who received a material benefit from the alleged misconduct and who faces a substantial liability on the claims asserted herein.

284.    McKelvey and Dorsey co-founded the Company together in 2009, but their history goes back many years. McKelvey (age 59) first met Dorsey (age 48) when Dorsey worked as a summer intern at McKelvey's company, Mira, in St. Louis, Missouri, when Dorsey was just fifteen years old.[265]  McKelvey is on record stating that he and Dorsey "have been friends and

---

[265] Shawn Flynn, "SV037: The Innovation Stack W/ Square Co-Founder Jim McKelvey, THE INVESTORS' PODCAST NETWORK (Apr. 16, 2020), *available at* https://www.theinvestorspodcast.com/silicon-valley/sv037-the-innovation-stack-with-square-co-founder-jim-mckelvey/.

colleagues ever since."[266]

285.    As of March 18, 2025, Forbes reported Dorsey's net worth to be \$3.9B, the majority of which is attributed to his nearly \$3 billion stake in Block.[267] Hence, the majority of Dorsey's wealth is attributable to Block and by extension, McKelvey, without whom Block would not exist.

286.    Based on the foregoing, Dorsey lacks independence from McKelvey, and it is reasonably conceivable that Dorsey, as a co-founder, friend and colleague, would not be able to impartially consider a litigation demand against McKelvey.

287.    Additionally, as a co-founder of the Company, Dorsey cannot reasonably be expected to commence suit against the other Board members of a company that he helped to create. Therefore, demand is further excused as to Dorsey.

### 2.    Defendant McKelvey Further Lacks Independence.

288.    McKelvey, who the Company concedes is not independent within the meaning of the listing standards of the NYSE, could not independently and disinterestedly consider a demand because he lacks independence from Dorsey, who received a material benefit from the alleged misconduct and who faces a substantial liability on all of the claims asserted herein.

289.    As previously stated, McKelvey and Dorsey co-founded the Company together in 2009, and their history goes back many years before that.  McKelvey (age 59) first met Dorsey (age 48) when Dorsey worked as a summer intern at McKelvey's company, Mira, in St. Louis, Missouri, when Dorsey was just fifteen years old.[268]  McKelvey is on record stating that

---

[266] *Id.*

[267] As reported in the 2024 Proxy, Dorsey owned 1,000,000 shares of Class A Common stock and 47,844,566 shares of Class B Common stock as of March 31, 2024. *See* 2024 Proxy at 41. Dorsey is not reported to have sold any shares since this time. Block's stock closed at \$58.65 per share on March 17, 2025, valuing his stake in the Company to be worth 2.86B.

[268] Shawn Flynn, "SV037: The Innovation Stack W/ Square Co-Founder Jim McKelvey, THE INVESTORS' PODCAST NETWORK (Apr. 16, 2020), *available at*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

he and Dorsey "have been friends and colleagues ever since."[269]  In 2024, Forbes reported McKelvey's net worth to be $1.8 billion, the majority of which is attributable to co-founding Block – something that would not have been possible without Dorsey.[270]  As set forth herein, McKelvey sold over half a billion dollars' worth of Block stock between August 2020 and August 2021, and as of February 21, 2025, his current Block holdings (12,390,552 shares) are valued at close to $850 million.  Hence, the majority of McKelvey's wealth is attributable to Block and by extension, Dorsey, without whom Block would not exist.

290.    Based on the foregoing, McKelvey lacks independence from Dorsey, and it reasonably conceivable that McKelvey, as a co-founder, friend and colleague, would not be able to impartially consider a litigation demand against Dorsey.

291.    Furthermore, as a co-founder of the Company, McKelvey cannot reasonably be expected to commence suit against the other Board members of a company that he helped to create.  Therefore, demand is further excused as to McKelvey.

### 3.    Defendant Botha Further Lacks Independence.

292.    Botha could not independently and disinterestedly consider a demand because he lacks independence from Dorsey and McKelvey, who received a material benefit from the alleged misconduct and who face a substantial liability on the claims asserted herein.

293.    Since January 2003, Botha has served in various positions at Sequoia Capital, a venture capital firm, including as a Senior Steward and as a Managing Member of Sequoia Capital Operations, LLC.  Sequoia Capital was an early investor in Block.  On January 10, 2011, the Wall Street Journal reported that the Company closed a new $27.5 million round of funding led by

---

https://www.theinvestorspodcast.com/silicon-valley/sv037-the-innovation-stack-with-square-co-founder-jim-mckelvey/.

[269] *Id.*

[270] *Forbes Profile of Jim McKelvey*, FORBES (Apr. 2, 2024), *available at* https://www.forbes.com/profile/jim-mckelvey/?list=billionaires

Sequoia Capital, boosting the Company's valuation from $45 million to around $240 million.[271] As part of the deal, Botha was named to the Company's Board of Directors.[272]  He has served as a Director of the Company ever since. The two-cofounders of Block, Dorsey and McKelvey were reliant on the financing from Sequoia Capital in order to scale the Company.  Based on the foregoing, Botha lacks independence from Dorsey and McKelvey.

294.    Botha further lacks independence from Dorsey.  Dorsey is one of the co-founders of Twitter, Inc. ("Twitter"), which was created in March 2006, and launched in July 2006.  From May 2007 to October 2008, Dorsey served as President and CEO of Twitter.  Dorsey returned to serve as CEO of Twitter from July 2015 until November 2021.  He served on the Board of Directors of Twitter from May 2007 to May 2022.  In May 2022, it was reported that Sequoia Capital invested $800 million in Elon Musk's ("Musk") bid to acquire Twitter.[273]  Botha was the partner overseeing Sequoia's investment. Sequoia, along with a group of other investors, invested over $7.1 billion into the deal,[274] which was completed on October 14, 2022, for a reported $44 billion. Prior to the acquisition, Dorsey owned more than 18 million shares in Twitter, valued at about $1 billion. Rather than cash out, Dorsey rolled over his ownership stake in Twitter to Musk's private venture (renamed "X").  At the time it was reported that Dorsey and Musk were friends who had a long "billionaire bromance."[275]  In fact, Dorsey endorsed Musk's takeover

---

[271] Pui-Wing Tam, *Twitter CO-Founder's 'Square' Raises 27.5 Million*, WALL STR. J. (Jan. 10, 2011), https://www.wsj.com/articles/BL-DGB-20780.

[272] *Id.*

[273] Sequoia has also invested in SpaceX and the Boring Co., two startups founded by Musk.

[274] Manish Singh, Sequoia, *Binance and a16z back Elon Musk's $44 billion Twitter bid*, TECHCRUNCH (May 5, 2022), *available at* https://techcrunch.com/2022/05/05/sequoia-binance-and-fidelity-back-elon-musks-bid-for-twitter/.

[275] Catherine Thorbecke, *Elon Musk subpoenas former Twitter CEO Jack Dorsey as legal battle heats up*, CNN BUSINESS (Aug. 22, 2022), *available at* https://www.cnn.com/2022/08/22/tech/elon-musk-jack-dorsey/index.html

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

efforts by tweeting "Elon's goal of creating a platform that is 'maximally trusted and broadly inclusive' is the right one."[276]

295.    Notably, Botha and Musk are inextricably linked.  Musk hired Botha to join what eventually became PayPal Holdings, Inc. ("PayPal") about twenty-five years ago, after Botha moved to the United States from South Africa.  From 2000 to 2003, Botha served in various positions at PayPal, including as CFO.  Consequently, Musk and Both are both members of what has come to be known as the "PayPal Mafia."  First coined by Fortune magazine in 2007, the PayPal Mafia is a group of approximately twenty-one former PayPal employees and founders who have since founded and/or developed additional technology companies based in Silicon Valley.[277]

296.    Dorsey's $1 billion reinvestment in Twitter not only helped Musk, it also helped to ensure that Sequoia's $800 million investment for Musk to acquire Twitter paid off.  Based on the foregoing, Botha lacks independence from Dorsey, and this "I got your back if you got mine mentality" makes it reasonably conceivable that Botha would not be able to impartially consider a litigation demand against Dorsey. Therefore, demand is further excused as to Botha.

### 4.    Defendant Carter Further Lacks Independence.

297.    Carter, who the Company concedes is not independent within the meaning of the listing standards of the NYSE, could not independently and disinterestedly consider a demand because he lacks independence from Dorsey, who received a material benefit from the alleged

---

[276] Alex Weprin, *Twitter Co-Founder Jack Dorsey Retained Stake in Company After Elon Musk Acquisition, Filings Show*, THE HOLLYWOOD REPORTER (Oct. 31, 2022), *available at* https://www.hollywoodreporter.com/business/digital/twitter-jack-dorsey-retains-stake-after-elon-musk-buy-1235252557/; Clare Duffy, *Twitter founder Jack Dorsey to remain invested in the company under Elon Musk*, CNN BUSINESS (Nov. 1, 2022), *available at* https://www.cnn.com/2022/11/01/tech/twitter-jack-dorsey-elon-musk/index.html.

[277] Jeffrey M. O'Brien, *The PayPal Mafia*, FORTUNE (Nov. 26, 2007), *available at* https://fortune.com/article/paypal-mafia/.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

misconduct and who faces a substantial liability on all of the claims asserted herein.

298.    Carter, known professionally as Jay-Z, is a musician, songwriter, record executive, producer and entrepreneur.  In 2015, Carter, in partnership with other recording artists, bought a Norwegian music streaming company, formerly called Aspiro, for $56 million and rebranded it as TIDAL. Carter was the public face of TIDAL and held a 27% stake in the company.

299.    TIDAL immediately struggled to gain popularity and market share compared to other music streaming services. By 2020, TIDAL had signed up 2.1 million paying subscribers, compared with Spotify's 138 million, Apple Music's 60 million, and Amazon Music's 55 million.[278] The company had suffered "multimillion-dollar losses in each of its previous ten quarters," had lost significant contracts, and accepted a $50 million loan from Carter to shore up its finances.[279]

300.    Despite its known struggles, on March 4, 2021, Block (formerly Square) publicly announced its plan to acquire a majority ownership stake in TIDAL and disclosed that the Company was planning on naming Carter to its Board of Directors subject to the closing of the transaction.[280]

301.    The deal closed on April 30, 2021, with Block acquiring an 86.23% ownership interest in TIDAL for a price of $237.3 million.  Carter, who remained a shareholder of TIDAL, subsequently became a member of Block's Board of Directors.  As part of the acquisition's consideration, Carter directly and indirectly through entities affiliated with him, received approximately $63.4 million in the aggregate, and a family member received approximately

---

[278] Jonathan Stempel, *Judge dismisses lawsuit over Block's 'terrible' purchase of Jay-Z's Tidal*, REUTERS (May 9, 2023), *available at* https://www.reuters.com/legal/judge-dismisses-lawsuit-over-blocks-terrible-purchase-jay-zs-tidal-2023-05-09/.

[279] *See City of Coral Springs Police Officers' Pension Plan on behalf of Block, Inc. v. Dorsey*, 2023 WL 3316246, at *2 (Del. Ch. May 9, 2022), aff'd, 308 A.3d 1189 (Del. 2023).

[280] Press Release, Square, Inc., Square, Inc. Announces Plan To Acquire Majority Ownership Stake in TIDAL, (Mar. 4, 2021), https://squareup.com/us/en/press/tidal.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

$450,000, in each case, in the form of cash and common stock. Carter was also reimbursed $4.5 million in connection with certain insurance expenses related to the transaction.

302.    Following Block's acquisition of TIDAL, on January 27, 2022, Block shareholders, led by a Florida pension fund, launched a derivative suit claiming that Dorsey only bought TIDAL as a favor to his friend, Jay-Z. *See City of Coral Springs Police Officers' Pension Plan on behalf of Block, Inc. v. Dorsey*, C.A. No. 2022-0091-KSJM (Del. Ch.) ("City of Coral Springs").

303.    The complaint in City of Coral Springs quoted an NYU business professor who called the purchase "a $300 million bar tab to hang out with Jay-Z." In fact, in its memorandum opinion dated May 9, 2023, the Delaware Court of Chancery opined that Block's acquisition of TIDAL "seemed, by all accounts, a terrible business decision." *City of Coral Springs*, 2023 WL 3316246, at *1 (Del. Ch. May 9, 2023).

304.    The City of Coral Springs complaint also detailed how Dorsey and Carter had purportedly begun discussing the potential acquisition of TIDAL by Block during 2020 when the two friends spent much of August together in the Hamptons. News articles published during this time period describe Dorsey as Carter's "new best friend," reference the two men as a "dynamic duo" and include pictures of Carter and Dorsey yachting around together.[281] A few months later, in November 2020, Dorsey and Carter were captured vacationing together in Hawaii.[282]

305.    Based largely on the allegations of Dorsey and Carter's burgeoning friendship, the Court in City of Coral Springs found that "[i]t [was] reasonably conceivable that Dorsey used corporate coffers to bolster his relationship with Carter." *City of Coral Springs*, 2023 WL

---

[281] Caitlyn Becker, *Beyonce shows off her stunning curves in a bohemian beach cover-up with daughter Rumi ... while Jay-Z continues hanging out with Twitter CEO Jack Dorsey*, DAILYMAIL.COM (Aug. 27, 2020); Shirley Gomez, "Jay-Z vacationing with Twitter CEO Jack Dorsey" HOLA! (Aug. 27, 2020).

[282] Tracy Wright, *Jay-Z carries a football on the beach after catching up with Sean Penn and Twitter CEO Jack Dorsey in Hawaii*, DAILYMAIL.com (Nov. 18, 2020).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

3316246, at *7.

306.    Additional allegations further illustrated the lack of independence between Dorsey and Carter.  For example, in April 2020, Dorsey and Carter jointly issued grants for COVID-19 relief totaling $6.2 million; Dorsey donated $10 million to Carter's nonprofit, Reform Alliance, in May 2020; and in February 2021, Dorsey and Carter created an endowment to fund bitcoin development in India and Africa, jointly contributing a total of $23.6 million.[283]

307.    Further, in June 2022, Block entered into a partnership with the Marcy Houses, a public housing complex in Brooklyn, New York operated by the New York City Housing Authority, to create the Bitcoin Academy, a project personally funded by Carter and Dorsey. Pursuant to such partnership, the Company agreed to provide certain monetary and equipment support and services for the Bitcoin Academy.  Since January 1, 2022, Block has provided approximately $0.7 million in monetary support and services towards the Bitcoin Academy.

308.    Subsequent to the Court's memorandum opinion in City of Coral Springs, in June 2023, Dorsey and Carter were again photographed vacationing together, this time in Lake Como, Italy.[284]  In fact, in Block's Questionnaire for Fiscal 2022 Reporting, Carter described Dorsey as a "personal friend and co-venturer."[285]

309.    Based on the foregoing, and as the Delaware Court of Chancery has already found, Carter lacks independence from Dorsey.  As a result, it is reasonably conceivable that Carter would not be able to impartially consider a litigation demand against Dorsey. Therefore, demand is further excused as to Carter.

### 5.    Defendant Meeker Further Lacks Independence.

310.    Meeker could not independently and disinterestedly consider a demand because

---

[283] *See City of Coral Springs*, 2023 WL 3316246, at *2, 5.

[284] Kate Dennett, *Beyonce stuns in a one-shouldered black dress as she and husband Jay Z relax while joining Twitter co-founder Jack Dorsey on a lavish billionaires' holiday to Lake Como*, DAILYMAIL.COM (Jun. 26, 2023).

[285] BlockKelly0000001290.

she lacks independence from Dorsey and McKelvey, who received a material benefit from the alleged misconduct and who face a substantial liability on the claims asserted herein.

311.    From December 2010 to December 2018, Meeker served as a General Partner of Kleiner Perkins Caufield & Byers ("Kleiner Perkins").  In June 2011, The New York Times reported that Block raised $100 million in a financing round led by Kleiner Perkins, and that as part of the deal, Meeker, a partner at Kleiner Perkins would join the Company's Board of Directors of Block.[286]  The two-cofounders of Block, Dorsey and McKelvey were reliant on the financing from Kleiner Perkins in order to scale the Company.

312.    Based on the foregoing, Meeker lacks independence from Dorsey and McKelvey. As a result, it is reasonably conceivable that Meeker would not be able to impartially consider a litigation demand against Dorsey and McKelvey. Therefore, demand is further excused as to Meeker.

### 6.    Non-Defendant Eisen Further Lacks Independence.

313.    Director Eisen could not independently and disinterestedly consider a demand because he lacks independence from Dorsey and McKelvey, who received a material benefit from the alleged misconduct and who face a substantial liability on the claims asserted herein. Director Eisen also lacks independence from Botha, Brooks, Carter, Deighton, Garutti, and Meeker.

314.    Director Eisen co-founded the Australian-based Afterpay, a "buy now, pay later" short-term financing company that allows consumers to finance goods through installment payments, in 2014.

315.    On August 1, 2021, Block first announced plans to acquire Afterpay.[287] According

---

[286] Evelyn M. Ruski, *Mobile Payments Start-Up Square Raises $100 Million*, N.Y. TIMES (Jun. 29, 2011),    https://archive.nytimes.com/dealbook.nytimes.com/2011/06/29/mobile-payments-start-up-square-raises-100-million/.

[287] Press Release, Block, Inc., *Square, Inc. Announces Plans to Acquire Afterpay, Strengthening and Enabling Further Integration Between Its Seller and Cash App Ecosystems* (Aug. 1, 2021), https://investors.block.xyz/investor-news/news-details/2021/Square-Inc.-Announces-Plans-to-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

to the terms of the acquisition, which was approved by both the Board of Directors of Block and Afterpay, Block would acquire all outstanding ordinary shares of Afterpay in stock-for-stock exchange whereby eligible Afterpay shareholders would receive 0.375 shares of Square stock for each share of Afterpay they owned (the "Afterpay Acquisition").  When the deal was announced, it was reported that Eisen and his co-founder, Nick Molnar ("Molnar"), would receive $2.7 billion in Block stock for their Afterpay shares, and that upon completion of the transaction, Eisen and Molar would jointly lead Afterpay's respective seller and consumer business, as part of Block's Square and Cash App ecosystems. [288]

316.    On November 3, 2021, the Company held a special meeting of stockholders in connection with the Afterpay Acquisition.[289]  The Company had previously disclosed that the Afterpay Acquisition would "require the affirmative vote of a majority of the voting power of the shares of Square common stock present or represented by proxy at the Special Meeting and entitled to vote thereon."[290] Holders of Class A Common Stock were entitled to one vote, whereas holders of Class B common Stock were entitled to ten votes.  As set forth herein, Dorsey and McKelvey combined to possess 61.32% of total voting power in 2021, thus, they possessed enough power ensure that the vote passed.

317.    On January 31, 2022, Block completed its $13.9 billion acquisition of Afterpay, and Eisen and Molar joined Block. In addition, Rothstein, a former Afterpay director, was named to the Block's Board of Directors.

318.    In June 2023, it was reported that Eisen had an estimated net worth of $1.26 billion,

---

Acquire-Afterpay-Strengthening-and-Enabling-Further-Integration-Between-its-Seller-and-Cash-App-Ecosystems/default.aspx

[288] Jonathan Shapiro and James Eyers, *Stunning $39B Afterpay triumph*, FINANCIAL REVIEW (Aug. 2, 2021),  https://www.afr.com/companies/financial-services/square-to-acquire-afterpay-in-39b-deal-20210802-p58eyi.

[289] *See* Block, Inc. Form 8-K, filed with the SEC on Nov. 3, 2021.

[290] *See* Block, Inc. Schedule 14A, filed with the SEC on Oct. 5, 2021.

which was attributable to his significant interest in Afterpay.[291]  Hence, the Afterpay Acquisition was material to his net worth.

319.    On or around October 30, 2024, Eisen stepped down from his executive duties at Block to purportedly pursue outside interests, but just over three months later, he was named to the Company's Board of Directors.

320.    Based on the foregoing, Eisen lacks independence from Dorsey and McKelvey, each of whom were quintessential in assuring the acquisition of Afterpay.

321.    Eisen likewise lacks independence from the Company's current Board members who, along with Dorsey and McKelvey, approved the Afterpay Acquisition – Botha, Brooks, Carter, Deighton, Garutti, and Meeker.

322.    As a result of the foregoing, it is reasonably conceivable that Eisen would not be able to impartially consider a litigation demand against Dorsey, McKelvey, Botha, Brooks, Carter, Deighton, Garutti, and Meeker. Therefore, demand is excused as to Eisen.

## IX.    <u>DAMAGES TO THE COMPANY</u>

323.    As a result of the foregoing breaches of fiduciary duty, Block has incurred significant expenses, and will continue to expend significant sums, including:

(a)    the $295 million in damages already incurred by the Company as a result of fines from regulatory activity taken by the CFPB, NYDFS and state regulators;

(b)    the costs incurred to carry out internal investigations, including the costs of legal and other fees paid to outside counsel, auditors, and other experts;

(c)    the costs incurred to rectify the Company's corporate governance failures, including any mandatory compliance measures instituted by the CFPB, state

---

[291] Alex Turner-Cohen, *Byron Bay real estate record broken as Afterpay founder Anthony Eisen buys beach house for $23m*, NEWS.COM.AU (Jun. 1, 2023), *available at* (https://www.news.com.au/finance/real-estate/buying/byron-bay-real-estate-record-broken-as-afterpay-founder-anthony-eisen-buys-beach-house-for-23m/news-story/f5c8b1dfa8aa8a42c997dd8d8309ed67.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    regulators and other agencies;

2    (d)    losses incurred as a result of the Defendants Dorsey and McKelvey's misuse of

3           proprietary and material non-public information;

4    (e)    loss in market value and stockholder equity;

5    (f)    damage to Block's reputation and goodwill; and

6    (g)    legal fees, costs, and amounts payable in settlement or satisfaction of lawsuits

7           brought against the Company related to the foregoing wrongdoing, including but

8           not limited to Securities Class Action.

9    324.    Block has been directly and substantially injured by reason of the Individual

10   Defendants' intentional breach and/or reckless disregard of their fiduciary duties of loyalty to the

11   Company.  Plaintiff, as a shareholder and representative of Block, seek damages and other relief

12   for the Company.

13   **X.    CLAIMS FOR RELIEF**

14                              **COUNT I:**

15             **Violations of Section 14(a) of the Exchange Act**

16   **(Against Defendants Dorsey, Deighton, Botha, Brooks, Carter, McKelvey, Garutti, Meeker,**

17                    **Rothstein, Summers, Viniar, and Walker)**

18   325.    Plaintiff incorporates by reference and realleges each and every allegation above

19   as though fully set forth herein.

20   326.    Defendants Dorsey, Deighton, Botha, Brooks, Carter, McKelvey, Garutti, Meeker,

21   Rothstein, Summers, Viniar, and Walker caused Block to issue the Proxy Statements to solicit

22   shareholder votes for the election of directors.

23   327.    As alleged in detail *supra* § VII, these Proxy Statements contained materially false

24   and incomplete disclosures, including by affirmatively touting the Company's risk management

25   and Board-level oversight, while failing to disclose:

26          (a)    the extent to which the Company's financial performance depended upon

27   the Company's artificially inflated guidance which failed to take into account that the Company

28   allowed its customers, including those who had been supposedly blacklisted from the Company's

systems, to continue to open multiple accounts on Cash App;

(b)  the extent to which the Director Defendants failed in their duties to oversee and ensure that the Company had functioning internal controls, enterprise risk management, and legal and regulatory compliance, including the Company's ongoing failure to detect and prevent fraud and other crimes from occurring on the platform, the Company's constantly bourgeoning compliance backlogs, and the failure to provide adequate levels of customer service;

(c)  the nature of the Director Defendants' performance of their duties under the charters of the Board's subcommittees, including the reason for the Director Defendants' decision to allow the Company to repeatedly relax its onboarding requirements in allowing customers to make multiple Square App accounts in order to favor growth through the illicit procurement of false customer accounts; and

(d)  the numerous instances in which the Board was informed that Cash App was used to facilitate unlawful conduct, including insurance fraud, fraudulent account takeovers, and other fraud; money laundering; gambling; drug dealing; sex trafficking; organized crime; and other illicit conduct.

328.  The false statements and omissions in each of the Proxy Statements concerned matters of material importance to the Company and were material to shareholders in response to the solicitations embodied in each Proxy Statement.  The Proxy Statements were an essential link in Defendants' conscious disregard for Block's known facilitation of unlawful conduct and disclosure of false financial metrics, as disclosure of the truth to shareholders would have brought an end to the shareholders' endorsement of Defendants Dorsey, Deighton, Botha, Brooks, Carter, McKelvey, Garutti, Meeker, Rothstein, Summers, Viniar, and Walker as fiduciaries and termination of the Company's compensation policies.

329.  Defendants Dorsey, Deighton, Botha, Brooks, Carter, McKelvey, Garutti, Meeker, Rothstein, Summers, Viniar, and Walker failed to include these material facts in the Proxy Statements, rendering the Proxy Statements materially false and misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

330.  As a direct and proximate result of the issuance of the materially false and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

misleading Proxy Statements, Block suffered direct and significant damages in the form of, *inter alia*, the perpetuation of widespread illicit conduct committed through the Company's banking instruments, substantial fines and penalties inflicted on the Company for this misconduct by regulators and substantial additional liabilities in the form of whistleblower complaints facing the Company.

331.    In connection with the improper acts alleged under this Count, Defendants Dorsey, Deighton, Botha, Brooks, Carter, McKelvey, Garutti, Meeker, Rothstein, Summers, Viniar, and Walker directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications or the facilities of a national securities exchange.

332.    This Count is only alleged against Defendants Dorsey, Deighton, Botha, Brooks, Carter, McKelvey, Garutti, Meeker, Rothstein, Summers, Viniar, and Walker as to those Proxy Statements that were issued during their terms as directors on the Board.

**COUNT II:**

**Violations of Section 10(b) of the Exchange Act**

**(Against the Individual Defendants)**

333.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

334.    During the Relevant Period, Defendants caused Block to repurchase millions of shares of the Company common stock at artificially inflated prices.

335.    In October 2023, the Board authorized Block officers to execute Company repurchases of up to $1 billion of the Company's Class A common stock.

336.    From November 2023 through April 2024, Defendants caused Block to repurchase 7,316,000 shares of Block common stock for over $506 million.

337.    In connection with Block's repurchases of Block shares, Defendants disseminated or approved false or misleading statements about Block specified in ¶¶ 71-82, 193, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and Defendants' course of conduct

were designed to artificially inflate the price of the Company's common stock.

338. At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Defendants, Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to Defendants' false or misleading statements.

339. Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Block in connection with the Bank's purchases of Block stock during the Relevant Period.

340. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Block stock, which were intended to, and did, (a) deceive Block regarding, among other things, its user engagement metrics, the increased risks taken to accelerate growth, the proliferation of fraud on the platform, the Company's internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of Block stock; and (c) cause Block to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the Relevant Period, Defendants were in possession of material, adverse non-public information regarding the illicit account creation scheme.

341. Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   statements made during the Relevant Period, as alleged above.

2   342.    As described above, Defendants acted with scienter throughout the Relevant

3   Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe

4   recklessness. The misstatements and omissions of material facts set forth in this Complaint were

5   either known to Defendants or were so obvious that Defendants should have been aware of them.

6   343.    Throughout the Relevant Period, Defendants also had a duty to disclose new

7   information that came to their attention and rendered their prior statements to the market

8   materially false or misleading.

9   344.    Defendants' false or misleading statements and omissions were made in

10  connection with the purchase or sale of the Company's stock, both by the Company itself and by

11  the Insider Trading Defendants.

12  345.    As a result of Defendants' misconduct, Block has and will suffer damages in that

13  it paid artificially inflated prices for Block common stock purchased as part of the repurchase

14  program and suffered losses when the previously undisclosed facts.

15  346.    As the truth was revealed, the price of Block's stock declined immediately and

16  precipitously as the artificial inflation was removed from the market price of the stock.

17  347.    On May 1, 2024, after *NBC News* reported that federal prosecutors were digging

18  into former employees' allegations of "widespread and yearslong compliance lapses" at the

19  Company, the price of Block Class A common stock fell from $73 per share at market close on

20  April 30, 2024, to $66.84 per share at market close on May 1, 2024 – a decline of over 8% on

21  unusually heavy trading volume of over 22 million shares traded.

22  348.    Block would not have purchased these securities at the prices it paid, or at all, but

23  for the artificial inflation in the Company's stock price caused by Defendants' false or misleading

24  statements.

25  349.    As a direct and proximate result of Defendants' wrongful conduct, the Company

26  suffered damages in connection with its purchases of Block stock during the Relevant Period. By

27  reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the

28  Exchange Act and SEC Rule 10b-5.

**COUNT III:**

**Violations of Section 29(b) of the Exchange Act**

**(Against the Individual Defendants)**

350.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

351.    As a result a result of their conduct, as alleged in this Complaint, Defendants violated Sections 10(b) and 14(a) of the Exchange Act during the time they entered into contracts with Block regarding their compensation.

352.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

353.    Defendants violated provisions of the Exchange Act while performing their duties arising under various employment and other contracts they entered into with Block.  Indeed, the violations of Section 14(a) stemming from the use of false and misleading proxy statements for shareholder votes are directly tied to each Defendants' employment with and/or compensation received from Block.

354.    Block was and is an innocent party with respect to Defendants' Exchange Act violations.

355.    Plaintiff, on behalf of Block, seeks rescission of the contracts between Defendants and Block due to Defendants' violations of the Exchange Act while performing their job duties.

356.    Plaintiff seeks only declaratory, injunctive, and equitable relief in this claim.

**COUNT IV:**

**Breach of Fiduciary Duty**

**(Against the Director Defendants)**

357.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

358.    By reason of their positions as directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Current Director Defendants and the Former Director Defendants (hereafter the "Director Defendants") owed the

Company and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. Each director of the Company owed to the Company and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, ensuring the Company's business was being conducted lawfully, and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

359. The Director Defendants, because of their positions of control and authority as directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

360. The Director Defendants violated and breached their fiduciary duties of candor, good faith and loyalty. More specifically, the Director Defendants violated their duty of good faith by failing to maintain an adequate system of oversight in failing to ensure that the Company maintained effective compliance and risk management systems and adhered to governing laws and regulations.

361. The Director Defendants were each involved in the alleged wrongdoing or aware of it and failed to act to stop it. To the extent any Director Defendant was unaware of the misconduct set forth therein, such Director Defendant was reckless in disregarding his/her duties to monitor the Company's core operations.

362. As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Block has sustained significant and actual damages, as alleged herein.

363. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

364. Plaintiff, on behalf of Block, has no adequate remedy at law.

**COUNT V:**

**Breach of Fiduciary Duty**

**(Against the Officer Defendants)**

365. Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

366. The Officer Defendants owed and continue to owe fiduciary obligations to Block

1    and its shareholders. By reason of their fiduciary relationships, the Officer Defendants owed and

2    owe Block the highest obligation of good faith, fair dealing, loyalty and due care.

3        367.    The Officer Defendants breached those fiduciary duties by knowingly and

4    intentionally implementing lax compliance measures and/or loosening the Company's

5    compliance measures in order to facilitate growth, which allowed fraud and other criminal activity

6    to proliferate on the Cash App platform.

7        368.    As a direct and proximate result of the Officer Defendants' failure to perform their

8    fiduciary obligations, Block has sustained significant and actual damages, as alleged herein.

9        369.    As a result of the misconduct alleged herein, the Officer Defendants are liable to

10    the Company.

11        370.    Plaintiff, on behalf of Block, has no adequate remedy at law.

**COUNT VI:**

**Breach of Fiduciary Duty for Insider Trading Under *Brophy***

**(Against the Insider Trading Defendants)**

15        371.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

16        372.    As directors of the Company at the time they sold shares of Block stock, the Insider

17    Trading Defendants owed Block and its shareholders a fiduciary duty of loyalty and good faith.

18        373.    At the time of the Insider Trading Defendants' stock sales, the Insider Trading

19    Defendants were in possession of material, adverse, non-public information as alleged herein, and

20    sold Company stock on the basis of such information.

21        374.    At the time of the Insider Trading Defendants' stock sales, the Insider Trading

22    Defendants possessed information concerning the Company's deficient compliance measures,

23    which allowed fraud and other illegal activity to run rampant on the Company's platform and

24    which served as the predicate for Block's continued growth.

25        375.    As the use of Company's proprietary information for their own gain constitutes a

26    breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to disgorge

27    and impose a constructive trust on any illegal profits obtained thereby.

28        376.    Plaintiff, on behalf of Block, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

A.      An order declaring that Plaintiff may maintain this action on behalf of Block, and that Plaintiff is an adequate representative of the Company;

B.      An order declaring that the Individual Defendants have breached their fiduciary duties to Block;

C.      An order declaring that the Individual Defendants have violated Sections 10(b), 14(a), and 29(b) of the Exchange Act;

D.      An order determining and awarding to Block the damages sustained by it as a result of the violations set forth above by the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

E.      An order imposing a constructive trust upon and ordering disgorgement of all profits made, or all losses avoided, by the Insider Trading Defendants as a result of the fiduciary breaches alleged herein, together with pre-judgment and post-judgment interest thereon;

F.      An order directing Block and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Block and its shareholders from a repeat of the wrongful conduct described herein;

G.      Awarding Plaintiff his costs and disbursements for this action, including reasonable attorneys' fees and expenses; and

H.      Granting such other relief as this Court deems just and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

April 24, 2025                              Respectfully submitted,

                                           _/s/ Jacob A. Walker___
                                           Jacob A. Walker (SBN 271217)
                                           **BLOCK & LEVITON LLP**
                                           400 Concar Drive
                                           San Mateo CA 94402
                                           (650) 781-0025

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

jake@blockleviton.com

Jason Leviton (*pro hac vice* forthcoming)
Nathan Abelman (*pro hac vice* forthcoming)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600
jason@blockleviton.com
nathan@blockleviton.com

Daniel B. Rehns (*pro hac vice* forthcoming)
Scott R. Jacobsen (*pro hac vice* forthcoming)
John W. Baylet (*pro hac vice* forthcoming)
**HACH    ROSE    SCHIRRIPA    &
CHEVERIE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
(212) 213-8311
drehns@hrsclaw.com
sjacobsen@hrsclaw.com
JBaylet@hrsclaw.com

*Counsel for Plaintiff James Kelly*

## VERIFICATION

I, James F. Kelly, hereby declare that I am the plaintiff in the foregoing Verified Shareholder Derivative Complaint (the "Complaint"), and that I have read the Complaint, know the contents thereof, and authorize its filing. I further declare that, as to the facts in the Complaint upon which I have personal knowledge, I believe those allegations to be true. Regarding the allegations in the Complaint of which I do not have personal knowledge, on information and belief, and relying on the investigation of counsel, I believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

Date: April ___23___, 2025

Signed by:

_James Kelly_____

James F. Kelly